**Robert TILTON (individually and sued as allegedly d/b/a Robert Tilton Ministries), Word of Faith World Outreach Center, Inc. (a dissolved corporation), and Word of Faith World Outreach Center Church et al., Relators,**

v.

**The Honorable John McClellan MARSHALL, Judge, Respondent.**

No. 94–1233.

Supreme Court of Texas.

Argued March 21, 1995.

Decided July 12, 1996.

Robert B. Wellenberger, Rhonda Johnson Byrd, David M. Taylor, Dallas, for Relators.

Dana C. Bowen, Tulsa, OK, Darrell Minter, Gary L. Richardson, Dallas, for Respondent.

PHILLIPS, Chief Justice, delivered the opinion of the Court on Motion for Rehearing as to Sections II and III and portions of Section I, in which GONZALEZ, HECHT, SPECTOR, OWEN, and ABBOTT, Justices, join and a plurality opinion as to the remaining portions of Section I in which SPECTOR, OWEN, and ABBOTT, Justices, join.

We grant relators' motion for rehearing in part and withdraw our prior opinions and judgment, and substitute the following opinion in its place.[1]

Based on their constitutional rights, relators complain that the trial court abused its discretion in refusing to dismiss the claims of the plaintiffs in the underlying suit, or, at least, in ordering the production of certain allegedly protected documents. Because we conclude that the trial court has abused its discretion in refusing to dismiss the plain-tiffs' claims of intentional infliction of emotional distress and related conspiracy claims, and in ordering the production of certain documents which are therefore irrelevant, we conditionally grant a writ of mandamus. We decline to grant writ against the trial judge for refusing to dismiss the plaintiffs' claims of fraud and conspiracy as related to fraud.

## FACTS

The underlying suit involves claims by real parties in interest Curtis High, Patsy High, Andrea Johnson, and Mary Elizabeth Turk (collectively, "plaintiffs") against Robert Tilton, Word of Faith World Outreach Center Church, Inc., and Word of Faith World Outreach Center Church (collectively, "Tilton"). Tilton is now the principal pastor of Word of Faith World Outreach Center Church near Dallas, Texas. In June 1993, plaintiffs sued Tilton and the two named church entities along with several other defendants, alleging fraud, conspiracy, and intentional infliction of emotional distress.[2]

Plaintiffs became aware of Tilton through his television programs about nine years ago. Patsy High, distraught over losing custody of her children, became convinced that Tilton could help her recover them. An avid viewer of Tilton's broadcasts, she and her husband Curtis sent him written prayer requests, donated more than $15,000 to him, and eventually joined his church. Johnson, a physically disabled welfare recipient, also contributed financially to Tilton, made prayer requests, and joined his church as a result of his television programs. Turk began watching Tilton's evangelistic broadcasts, particularly those about faith healing, while caring for her ailing husband. Suffering herself from severe physical pain of unknown causes, Turk contacted Tilton's "prayer line" to make a $1,000 donation to his church. Tilton sent her various mailings, along with a "prayer cloth" to place on the parts of her body that were in pain or needed healing. These mail-

---

1. Sections II and III of this opinion constitute the opinion of the Court, along with those portions of section I in which Justices Gonzalez and Hecht join. The remaining portions of section I constitute a plurality opinion.

2. Plaintiffs' First Amended Petition also alleged claims for negligent infliction of emotional distress, but the trial court granted Tilton's Motion for Summary Judgment with respect to those causes of action. *See Boyles v. Kerr*, 855 S.W.2d 593, 594 (Tex.1993).

ings stated that Tilton had personally anointed the prayer cloth with convalescent power. Turk later donated nearly $500 more to Tilton, forgoing medical treatment for her pain. When her pain grew worse, Turk consulted a doctor and discovered she was terminally ill with rectal cancer. Turk is now deceased, and Dr. Toni R. Turk and Vicki Crenshaw are prosecuting her claims on behalf of her estate.

Plaintiffs allege, among other things, that Tilton represented "through . . . televised programs, . . . [a telephone] prayer line, and . . . mailings, including those viewed by and received by Plaintiffs," that if they called the prayer line and made a "monetary vow or mail[ed] a monetary donation to Robert Tilton Ministries" with a prayer request included, "Tilton will personally and actually read, touch and pray over each of these requests and that thereby, the one making the vow and request will receive whatever is requested." [3] Plaintiffs claim that Tilton made these and other representations in bad faith and that the representations were both fraudulent and intentional infliction of emotional distress.

During discovery, plaintiffs served Tilton with a subpoena duces tecum requesting, among other documents, "[r]ecords identifying the entities and/or charities that Robert Tilton has tithed to during the seven (7) years next preceding this request, and the amount thereof." Tilton moved to quash the

deposition. After two hearings, the trial court issued an order requiring Tilton to produce these tithing records "on or before the 1st day of December, 1994. . . ."

■ Tilton then filed an emergency motion for leave to file petition for writ of prohibition or writ of mandamus with this Court.[4] In it, Tilton requested the Court to "issue a writ of mandamus directing [the trial court] . . . to reverse and vacate [its] . . . order . . . compelling production of religious tithing records; and issue a writ . . . directing [the trial court] . . . to exercise no further jurisdiction over this case, except to enter an order dismissing all claims against" Tilton. We granted leave and stayed both the trial court's production order and all proceedings in the underlying suit pending our decision.

Tilton argues that the trial court abused its discretion by refusing to dismiss the underlying action and by ordering the production of his tithing records. He claims that the Texas Constitution, the United States Constitution, and the federal Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. §§ 2000bb–2000bb–4 (Supp. V 1993),[5] bar plaintiffs' causes of action against him and prohibit the trial court from ordering him to produce his tithing records. Plaintiffs respond that neither the trial court's discovery order nor its refusal to dismiss the underlying suit is an abuse of discretion justifying interlocutory relief.

**3.** In mailings allegedly typical of the ones plaintiffs received, Tilton states, among other things:

> When I receive your sheet . . . I am going to take it and touch it and command a blessing of the tithe and offering upon what you have given to God. . . . I will . . . place the blessing of God's Word upon your gift of faith to Him. . . . I am going to lay my hands on your BEST REQUESTS and release my faith for you. I am going to pray and prophesy as the Spirit of God directs me in that moment for you. . . . Send your requests back to me. Enclose the four seeds you've held in your hand. The seeds that I've prayed over you have now touched and I will touch them again. They will become your miracle link for the miracle harvest you desire to have in your life. . . . I will pray and speak the very Word that Angels hearken to over your requests. I will let the Spirit of God guide me as I do. Rush your requests to me today!

**4.** A writ of prohibition directs a lower court to refrain from doing some act while a writ of mandamus commands a lower court to do some act. The same principles control the use of both writs when, as Tilton urges the Court in this case, they are invoked to correct the unlawful assumption of jurisdiction by an inferior court. *See Canadian Helicopters Ltd. v. Wittig*, 876 S.W.2d 304, 309 n. 12 (Tex.1994).

**5.** We note that the constitutionality of the RFRA was recently upheld in *Flores v. City of Boerne*, 73 F.3d 1352 (5th Cir.1996), *petition for cert. filed*, 65 U.S.L.W. 3017 (U.S. June 25, 1996) (No. 95–2074). Other courts have also determined that the RFRA is constitutional pursuant to Congress's enforcement powers under § 5 of the Fourteenth Amendment. *See Sasnett v. DOC*, 891 F.Supp. 1305 (W.D.Wis.1995); *Belgard v. Hawaii*, 883 F.Supp. 510, 516–17 (D.Haw.1995); *State v. Miller*, 538 N.W.2d 573, 577 (Wis.App. 1995, petition for review filed). No party raises a constitutional challenge to the RFRA here.

## I.

### A.

■ While Article I, Section 6 of the Texas Constitution and the First Amendment to the United States Constitution afford broad protection to the free exercise of religion, they do not necessarily bar all claims which may touch on religious conduct. The authors of the interpretive commentary to the provision of the Texas Constitution protecting freedom of worship state that

> the free exercise of religion does not go so far as to be inclusive of actions which are in violation of social duties or subversive of good order. Although freedom to believe may be said to be absolute, freedom of conduct is not and conduct even under religious guise remains subject to regulation for the protection of society.

TEX. CONST. art. I, § 6 interp. commentary (Vernon 1984); *see also Lide v. Miller,* 573 S.W.2d 614, 614–15 (Tex.Civ.App.-Texarkana 1978, no writ). The federal constitution similarly distinguishes between the freedom to believe, which is absolute, and the freedom to act, which "remains subject to regulation for the protection of society." *Cantwell v. Connecticut,* 310 U.S. 296, 303–04, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940).[6] The Free Exercise Clause never has immunized clergy or churches from all causes of action alleging tortious conduct. *See Van Schaick v. Church of Scientology of California, Inc.,* 535 F.Supp. 1125, 1142 (D.Mass.1982); *see also Molko v. Holy Spirit Ass'n for the Unification of World Christianity,* 46 Cal.3d 1092, 252 Cal.Rptr. 122, 133, 762 P.2d 46, 57 (1988), *cert. denied,* 490 U.S. 1084, 109 S.Ct. 2110, 104 L.Ed.2d 670 (1989) ("[R]eligious groups

may be held liable in tort for secular acts ... [and] in appropriate cases courts will recognize tort liability even for acts that are religiously motivated."); *Murphy v. International Soc'y of Krishna Consciousness of New England, Inc.,* 409 Mass. 842, 571 N.E.2d 340, 346 (1991), *cert. denied,* 502 U.S. 865, 112 S.Ct. 191, 116 L.Ed.2d 152 (1991) (noting that the freedom to act on religious beliefs does not enjoy the same protection as the freedom to believe certain principles); *Meroni v. Holy Spirit Ass'n for the Unification of World Christianity,* 119 A.D.2d 200, 506 N.Y.S.2d 174, 176 (N.Y.App.Div.1986) ("[A] church may be held liable for intentional tortious conduct on behalf of its officers or members, even if that conduct is carried out as part of the church's religious practices.").

■ Thus when a plaintiff's suit implicates a defendant's free exercise rights, the defendant may assert the First Amendment as an affirmative defense to the claims against him. *See Paul v. Watchtower Bible & Tract Soc'y of New York, Inc.,* 819 F.2d 875, 879 (9th Cir.1987), *cert. denied,* 484 U.S. 926, 108 S.Ct. 289, 98 L.Ed.2d 249 (1987); *see also New York Times Co. v. Sullivan,* 376 U.S. 254, 282–83, 84 S.Ct. 710, 727, 11 L.Ed.2d 686 (1964); *Carrieri v. Bush,* 69 Wash.2d 536, 419 P.2d 132, 137 (1966); *McNamara v. Freedom Newspapers, Inc.,* 802 S.W.2d 901, 904 (Tex.App.-Corpus Christi 1991, writ denied). One seeking an exemption based on faith from a facially neutral, generally applicable statute, regulation, or common law principle must first demonstrate to the court that the application thereof would substantially burden his or her free exercise of religion. *See* RFRA, 42 U.S.C. § 2000bb–1; *Sherbert v. Verner,* 374 U.S.

---

**6.** Because Tilton has not argued persuasively for a different application of the provisions of the First Amendment and Article I, Section 6 as they pertain to the free exercise of religion, we assume without deciding that the state and federal free exercise guarantees are coextensive with respect to his particular claims. The construction of any provision of the Texas Constitution depends upon factors such as the language of the constitutional provision itself, its purpose, the historical context in which it was written, the intention of the framers and ratifiers, the application in prior judicial decisions, the relation of the provision to other parts of the Constitution and the law as a whole, the understanding of

other branches of government, the law in other jurisdictions, state and federal, constitutional and legal theory, and fundamental values including justice and social policy. *See Ex parte Tucci,* 859 S.W.2d 1, 18 n. 3 (Tex.1993) (Phillips, C.J., concurring). Tilton's briefs to this Court address almost none of these factors. While interesting developments are occurring in state religion clauses in other jurisdictions, *see, e.g.,* Neil McCabe, *The State and Federal Religion Clauses: Differences of Degree and Kind,* 5 ST. THOMAS L.REV. 49 (1992), we are reluctant to decide an issue as important as the scope of the Texas Constitution's free exercise guarantee under these circumstances.

398, 403, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965 (1963); *People v. Woody*, 61 Cal.2d 716, 40 Cal.Rptr. 69, 394 P.2d 813, 816 (1964); TRIBE, AMERICAN CONSTITUTIONAL LAW § 14–12, at 1242 (2d ed. 1988). If this showing is made, the government must show to the court that granting the exemption would significantly hinder a compelling state interest. *See* RFRA, 42 U.S.C. § 2000bb–1; *Sherbert*, 374 U.S. at 403, 83 S.Ct. at 1793; TRIBE, *supra*, § 14–12 at 1242.

■ Before a court can determine whether a law or regulation substantially burdens one's free exercise rights, the individual generally must establish by a preponderance of the evidence that the beliefs avowed are not only religious in nature, but also sincerely held. *See, e.g., Mosier v. Maynard*, 937 F.2d 1521, 1526 (10th Cir.1991); *Philbrook v. Ansonia Bd. of Educ.*, 757 F.2d 476, 481 (2nd Cir.1985), *aff'd*, 479 U.S. 60, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986); *Africa v. Commonwealth of Pennsylvania*, 662 F.2d 1025, 1029–30 (3rd Cir.1981), *cert. denied*, 456 U.S. 908, 102 S.Ct. 1756, 72 L.Ed.2d 165 (1982); *Alabama and Coushatta Tribes of Texas v. Trustees of the Big Sandy Ind. Sch. Dist.*, 817 F.Supp. 1319, 1328 (E.D.Tex.1993), *remanded*, 20 F.3d 469 (5th Cir.1994); *Woody*, 40 Cal.Rptr. 69, 394 P.2d at 820–21; Note, *Burdens on the Free Exercise of Religion: A Subjective Alternative*, 102 HARV.L.REV. 1258, 1270 (1989).[7]

**B.**

■ Although these rules have generally served to balance the rights of claimants against a defense of religious freedom, they do not suffice in cases where fraud is alleged. *See generally*, Stephens, Annotation, *Free Exercise of Religion Clause of First Amendment as Defense to Tort Liability*, 93 A.L.R. FED. 754 (1989) (noting that "[a]ctions for fraud ... raise especially delicate issues with

regard to religious freedom"). To establish fraud, a plaintiff ordinarily must prove, among other things, that the defendant has made a false representation. *See, e.g., Stone v. Lawyers Title Ins. Corp.*, 554 S.W.2d 183, 185 (Tex.1977). But while courts have the capacity to inquire into the sincerity of a person's beliefs, the First Amendment prohibits courts from determining the veracity of religious tenets. *United States v. Ballard*, 322 U.S. 78, 86, 64 S.Ct. 882, 886, 88 L.Ed. 1148 (1944). Hence, no claim of fraud may be made if it rests on a representation of religious doctrine or belief—even if insincerely made. *See Van Schaick*, 535 F.Supp. at 1142–43; *Molko*, 252 Cal.Rptr. 122, 762 P.2d at 58; *Christofferson v. Church of Scientology of Portland*, 57 Or.App. 203, 644 P.2d 577, 598 (1982), *cert. denied*, 459 U.S. 1206, 103 S.Ct. 1196, 75 L.Ed.2d 439 (1983). For example, most courts would probably hold that a claim of fraud is not actionable if based upon the representation that, in exchange for a monetary contribution, God will cure a sick donor's illness. As long as the representation forming the basis of the fraud claim is a religious doctrine or belief, it is constitutionally protected from judicial inquiry. *See, e.g., Christofferson*, 644 P.2d at 605.

■ Consequently, the religious objector's sincerity is irrelevant when a claim of fraud is based solely on a statement of religious doctrine or belief. *See Anderson v. Worldwide Church of God*, 661 F.Supp. 1400, 1401 (D.Minn.1987); *Van Schaick*, 535 F.Supp. at 1134–35. To avoid conducting "heresy trials," courts may not adjudicate the truth or falsity of religious doctrines or beliefs. *See* Weiss, *Privilege, Posture and Protection: Religion in the Law*, 73 YALE L.J. 593, 607 (1964). As the Supreme Court has explained:

---

7. The Supreme Court of the United States has likewise suggested that an inquiry into the sincerity of a claimant's religious beliefs is proper where free exercise rights are asserted. *See Wisconsin v. Yoder*, 406 U.S. 205, 235, 92 S.Ct. 1526, 1543, 32 L.Ed.2d 15 (1972) ("the Amish in this case have convincingly demonstrated the sincerity of their religious beliefs"); *Thomas v. Review Bd. of Indiana Employment Sec. Division*, 450 U.S. 707, 715–16, 101 S.Ct. 1425, 1431, 67

L.Ed.2d 624 (1981)("petitioner terminated his work because of an honest conviction that such work was forbidden by his religion"); *Frazee v. Illinois Dept. of Employment Sec.*, 489 U.S. 829, 833, 109 S.Ct. 1514, 1517, 103 L.Ed.2d 914 (1989) ("nor do we underestimate the difficulty of distinguishing between religious and secular convictions and in determining whether a professed belief is sincerely held").

"The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect." *Watson v. Jones,* 13 Wall. 679, 728 [20 L.Ed. 666 (1871)].... Heresy trials are foreign to our Constitution. Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs. Religious experiences which are as real as life to some may be incomprehensible to others. Yet the fact that they may be beyond the ken of mortals does not mean that they can be made suspect before the law.... The Fathers of the Constitution were not unaware of the varied and extreme views of religious sects, of the violence of disagreement among them, and of the lack of any one religious creed on which all men would agree. They fashioned a charter of government which envisaged the widest possible toleration of conflicting views. Man's relation to his God was made no concern of the state. He was granted the right to worship as he pleased and to answer to no man for the verity of his religious views.

*Ballard,* 322 U.S. at 86–87, 64 S.Ct. at 886–87. Therefore, because the truth or falsity of a religious representation is beyond the scope of judicial inquiry, the sincerity of the person making such a representation is irrelevant when the religious representation forms the basis of a fraud claim. Whether the statement of religious doctrine or belief is made honestly or in bad faith is of no moment, because falsity cannot be proved.

### C.

■ The representations on which plaintiffs base their fraud claims fall into two categories. One concerns Tilton's alleged representations that he would perform certain concrete acts: personally reading, touching, and praying over plaintiffs' prayer requests. The fraud claims based on these alleged representations do not infringe upon Tilton's constitutional rights. They are based not on statements of religious doctrine or belief, but on Tilton's alleged promises to perform particular acts. *See Ballard,* 322 U.S. at 95, 64 S.Ct. at 890 (Jackson, J., dissenting)(arguing for dismissal of fraud indictment for insincere religious representa-

tions rather than remand, and stating "I do not doubt that religious leaders may be convicted of fraud for making false representations on matters other than faith or experience, as for example if one represents that funds are being used to construct a church when in fact they are being used for personal purposes.") Although the trier of fact must determine whether Tilton made these promises and failed to perform them, plaintiffs may satisfy the falsity element of a fraud claim by proving that Tilton had no intention of personally reading, touching, and praying over their prayer requests at the time he said he would do so. *See T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d 218, 222 (Tex.1992).

■ The second group of claims involves Tilton's allegedly fraudulent and deceitful representations of religious doctrine or belief. These representations, plaintiffs contend, were neither religiously motivated nor based on any sincere religious belief when Tilton made them, and therefore fall outside the protection of the First Amendment. For instance, plaintiffs complain of Tilton's requests for funds, which repeatedly emphasize that the Bible commands adherents to tithe. Citing numerous quotes from the Bible, Tilton states in a mailing typical of the ones plaintiffs received:

> I feel the Holy Spirit prompting me to challenge you in the name of Jesus to send $100 right now.... This is your day to prove God for your miracle.... When God says to prove Him, it's time to prove Him. I challenge you to prove Him now with a $100 offering to seed into the work of God and help us carry this anointed Elijah ministry to the four corners of the earth.... Jesus said, "Freely you have received, freely give" (Mt. 10:8 NIV).... All through the Bible, men and women consistently worshipped God by giving offerings and sacrificial gifts. God always manifested Himself in their lives and He will do the same for you when you worship him with sacrificial offerings....

Whether or not made sincerely, such representations are statements of religious doctrine or belief. *See, e.g., United States v. Seeger,* 380 U.S. 163, 176, 85 S.Ct. 850, 859,

13 L.Ed.2d 733 (1965) (indicating that beliefs are religious if "based upon a power or being, or upon a faith to which all else is subordinate or upon which all else is ultimately dependent"). As such, no jury can be allowed to determine their truth or falsity, for "[w]hen triers of fact undertake that task, they enter a forbidden domain." *Ballard*, 322 U.S. at 87, 64 S.Ct. at 887.

### D.

■ For JUSTICES GONZALEZ AND HECHT, relief is justified because some of plaintiffs' fraud claims appear to be based on just such representations of religious doctrine or belief by Tilton. We cannot conclude that Tilton's constitutional rights will be violated by this suit, however, because we cannot determine on this abbreviated record exactly which of Tilton's representations plaintiffs will rely upon to prove their claims of fraud. The record before us includes only the copy of plaintiffs' most recent petition and excerpts from transcripts of their depositions. As far as we can tell, Tilton has far from exhausted his opportunities to identify the alleged misrepresentations on which plaintiffs ground their claims. He apparently has not served plaintiffs with any interrogatories asking precisely which statements their fraud claims are based upon, nor has he specially excepted to plaintiffs' petition. The dynamic nature of the trial process makes it imprudent for us to structure the trial based on such an abbreviated record. While plaintiffs' counsel at oral argument before us made several statements that indicated a present intent to proceed on inappropriate theories, we are loath to substitute these comments for a factually developed record. Hence, we do not hold that the trial court has erred to such an extent that correction by extraordinary writ is justified.

Nevertheless, we caution that a failure by the trial court to carefully consider each of the alleged misrepresentations on which plaintiffs base their fraud claims may irreparably violate Tilton's constitutional rights. The trial court must identify those statements upon which plaintiffs' fraud claims are based, determine which ones, if any, involve religious doctrines or beliefs, and ensure that the trier of fact does not hear evidence regarding them or pass on their veracity.

### E.

■ Because it is beyond judicial inquiry whether plaintiffs' prayers would have been answered had Tilton fulfilled his promises to read, touch, and pray over their tithes and prayer requests, plaintiffs' damages, if any, may not include compensation for their allegedly unanswered prayers. Ordinarily, the measure of damages in a fraud case is the actual amount of the plaintiff's loss that directly and proximately results from the defendant's fraudulent conduct. *See, e.g., Holmes v. P.K. Pipe & Tubing, Inc.*, 856 S.W.2d 530, 543 (Tex.App.-Houston [1st Dist.] 1993, no writ); *C & C Partners v. Sun Exploration and Prod. Co.*, 783 S.W.2d 707, 718–19 (Tex.App.-Dallas 1989, writ denied); *Duval County Ranch Co. v. Wooldridge*, 674 S.W.2d 332, 335 (Tex.App.-Austin 1984, no writ). In this case, therefore, plaintiffs may recover only their donations to Tilton, together with any other pecuniary loss suffered as a consequence of their reliance upon his misrepresentations.[8] Plaintiffs also may seek exemplary damages. *See generally*, EDGAR & SALES, TEXAS TORTS AND REMEDIES § 44.04[2][b] (1995) ("Exemplary damages ... may usually be recovered by the successful claimant in an action for common-law fraud."). Under no circumstances, however, may the trial court compensate plaintiffs for their allegedly unfulfilled prayers.

### F.

■ We also deny Tilton the relief he seeks from plaintiffs' conspiracy claims as

---

8. According to JUSTICE HECHT, "compensatory damages cannot be recovered because there is no way to determine the value of what plaintiffs received" since Tilton conferred some benefit on plaintiffs by praying for them generally. *Infra* at ——. Were the evidence in the summary judgment record solely that plaintiffs donated to Tilton because of his representations that he would pray for them generally, JUSTICE HECHT might be correct. But if plaintiffs can convince the trier of fact that they specifically relied on Tilton's promises to personally read, touch, and pray over their tithes and prayers requests and would not have contributed to him but for that, any value of Tilton's general prayers would be irrelevant.

they relate to fraud. Civil conspiracy, generally defined as a combination of two or more persons to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means, might be called a derivative tort. *See Carroll v. Timmers Chevrolet, Inc.,* 592 S.W.2d 922, 925 (Tex.1979). That is, a defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable. *See id.* As a result, we do not analyze the trial court's refusal to dismiss plaintiffs' causes of action for conspiracy separately from its refusal to dismiss their other causes of action. If the trial court did not abuse its discretion in refusing to dismiss all of plaintiffs' fraud claims, then, *a priori,* it did not abuse its discretion in refusing to dismiss the claims of conspiracy related to fraud. *See generally,* EDGAR & SALES, *supra,* § 3.02[2].

## II.

Tilton next seeks relief from the trial court's refusal to dismiss plaintiffs' claims of intentional infliction of emotional distress. As with their fraud claims, plaintiffs allege that Tilton's intentional infliction of emotional distress took two forms: 1) making insincere religious representations, and 2) breaching promises to read, touch, and pray over their tithes and prayer requests. *See Twyman v. Twyman,* 855 S.W.2d 619, 621 (Tex. 1993). Although we have allowed plaintiffs to proceed on their fraud claims once narrowed to include only the promises to read, touch and pray, we conclude that such a distinction is not available to permit claims of intentional infliction of emotional distress.

 Resolving whether Tilton has intentionally inflicted emotional distress through the making of insincere religious representations would inevitably require an inquiry into whether Tilton's religious beliefs are true or false. One of the elements that a plaintiff must prove to establish intentional infliction of emotional distress is that the conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *See Twyman,* 855

S.W.2d at 621. With regard to religious representations, we conclude that no conscientious fact finder would make such a determination without at least considering the objective truth or falsity of the defendants' beliefs, regardless of what evidentiary exclusions or limiting instructions were attempted. After all, the outrageousness and extremity of a representation is, under almost any circumstance, aggravated by being false or mitigated by being true. Whether consciously or unconsciously, that premise would inevitably inform the trier of fact's consideration of the outrageousness of a religious representation. We would expect too much to ask any trier of fact to disregard any consideration of the truth or falsity of a religious representation when deciding whether it is outrageous and extreme. Such a demand might be metaphysically possible, but practically it would be impossible. The danger that the trier of fact would subconsciously weigh the representations against his own preconceived notions of truth and falsity, even while struggling to keep truth and falsity out of the equation, creates an unacceptable risk of constitutional impingement.

While the "read, touch and pray" issue is perhaps closer, we similarly conclude that any consideration of whether the alleged conduct was extreme and outrageous would inevitably entail an evaluation by the fact finder of the truth or veracity of those religious beliefs espoused by Tilton. Because the First Amendment strictly prohibits entry into this "forbidden domain," *see Ballard,* 322 U.S. at 86–87, 64 S.Ct. at 886–87, the trial court therefore abused its discretion by not dismissing all of plaintiffs' claims for intentional infliction of emotional distress.

 We are not, of course, granting mandamus relief to Tilton merely because we conclude that plaintiffs cannot prevail on certain claims. Mandamus is an "extraordinary" remedy, reserved for "manifest and urgent necessity," *Holloway v. Fifth Court of Appeals,* 767 S.W.2d 680, 684 (Tex.1989), and will not issue unless relator satisfies a heavy burden of establishing "compelling circumstances." *See* TEX.R.APP.P. 121(a)(2)(D); *Canadian Helicopters, Ltd. v. Wittig,* 876 S.W.2d 304, 306 (Tex.1994); *Walker v. Pack-*

*er,* 827 S.W.2d 833, 842 n. 9 (Tex.1992). Under *Walker,* a relator seeking mandamus must show that respondent either failed to perform a clear legal duty or committed a clear abuse of discretion; that relator's legal remedies are inadequate; and that the petition raises important issues for the state's jurisprudence. *Id.* at 840–41 and 839 n. 7.

We hold that this high burden of proof is met in this case as to the trial court's refusal to dismiss plaintiffs' claims for intentional infliction of emotional distress. The petition raises important issues related to constitutional protections afforded by the First Amendment which an appeal cannot adequately protect. Adjudication of the claims for intentional infliction of emotional distress would necessarily require an inquiry into the truth or falsity of religious beliefs that is forbidden by the Constitution. *See Ballard,* 322 U.S. at 86–87, 64 S.Ct. at 886–87. The trial itself, therefore, and not merely the imposition of an adverse judgment, would violate relator's constitutional rights. *Cf. Van Cauwenberghe v. Biard,* 486 U.S. 517, 526–27, 108 S.Ct. 1945, 1951–52, 100 L.Ed.2d 517 (1988) (unanimous Court stating that "in the context of due process restrictions on the exercise of personal jurisdiction, this Court has recognized that the individual interest protected is in 'not being subject to the binding judgments of a forum with which [the defendant] has established no meaningful "contacts, ties, or relations," ' " *citing Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), and that "the right not to be subject to a binding judgment may be effectively vindicated following final judgment"). While mandamus may not be appropriate in every case in which constitutional rights are impaired, we believe that mandamus relief is justified under these facts. Because we grant Tilton the relief he seeks from plaintiffs' intentional infliction of emotional distress claims, we likewise grant relief from plaintiffs' conspira-cy claims as they relate to intentional infliction of emotional distress.

We therefore grant Tilton's motion for leave to file the petition for mandamus, and conditionally grant the writ in part pursuant to Texas Rule of Appellate Procedure 122. If the trial court fails to dismiss the plaintiffs' claims for intentional infliction of emotional distress and related conspiracy claims, or exercises any further jurisdiction over those claims except to dismiss them, the writ will issue.

### III.

We now consider Tilton's contention that mandamus should also issue because the trial court compelled the production of his tithing records. Our dismissal of all but Tilton's fraud claims as to promised but not performed conduct has rendered these highly personal documents irrelevant. Because we hold that, under the circumstances of this case, mandamus relief is justified on that basis alone, we need not reach Tilton's argument that the First Amendment rights of free exercise of religion and freedom of association shield these records from discovery.[9]

Litigants "may obtain discovery regarding any matter which is relevant to subject matter in the pending action whether it relates to the claim or defense of the party seeking discovery or the claim or defense of any other party." TEX.R.CIV.P. 166b(2)(a). Tilton's tithing records are not even potentially relevant to the only remaining issue in this case, whether Tilton committed fraud by promising and by then failing to read, touch and pray over plaintiffs' prayer requests.

Mandamus will lie to correct a discovery error only if the discovery order constitutes a clear abuse of discretion, and the aggrieved party has no adequate remedy by ordinary appeal. *National Tank Co. v. Brotherton,* 851 S.W.2d 193, 196 (Tex.1993). A discovery order mandating the disclosure

---

9. Obviously, because our judgment has changed in response to the motion for rehearing, Tilton has not had the opportunity to argue that we should compel the trial court to vacate its discovery order because his tithing records are irrelevant to the only remaining claim—fraud related to the promises to read, touch and pray. Howev-er, because Tilton's second point of error on rehearing argues that "Reverend Tilton's tithing records are not relevant to the subject matter in the pending action," albeit on other grounds, we believe the issue is sufficiently raised so as to justify our considering it in this opinion.

of irrelevant documents does not normally satisfy this standard for mandamus relief. However, "[w]here a discovery order compels the production of patently irrelevant or duplicative documents, such that it ... imposes a burden on the producing party far out of proportion to any benefit that may obtain to the requesting party," mandamus relief may also be justified. *Walker*, 827 S.W.2d at 843, citing *Sears, Roebuck & Co. v. Ramirez*, 824 S.W.2d 558 (Tex.1992) (demand for tax returns); *General Motors Corp. v. Lawrence*, 651 S.W.2d 732 (Tex.1983)(demand for information about all vehicles for all years). *See also Texaco, Inc. v. Sanderson*, 898 S.W.2d 813 (Tex.1995).

Here, the burden imposed by the discovery order derives from the fact that the documents ordered disclosed are not only irrelevant but also highly sensitive and personal. In many respects, this request resembles those for tax returns. Thus, in *Crane v. Tunks*, 160 Tex. 182, 328 S.W.2d 434 (1959), we rejected relators' argument that tax returns are privileged and not subject to discovery. We held, however, that the trial court abused its discretion by requiring defendant to produce defendant's 1950 income tax return without first examining it to determine which parts were relevant to the litigation. Three years later, in *Maresca v. Marks*, 362 S.W.2d 299, 300 (Tex.1962), we again granted a conditional writ on the basis that the trial court clearly abused its discretion by requiring disclosure of irrelevant information contained in income tax returns, including private information regarding charitable contributions.

> Subjecting federal income tax returns of our citizens to discovery is sustainable only because the pursuit of justice between litigants outweighs protection of their privacy. But sacrifice of the latter should be kept at a minimum, and this requires scrupulous limitation of discovery to information furthering justice between the parties which, in turn, can only be information of

relevancy and materiality to the matters in controversy.

*Maresca v. Marks*, 362 S.W.2d at 301. Most recently, in *Hall v. Lawlis*, 907 S.W.2d 493 (Tex.1995), we granted mandamus relief from a trial court's order compelling the production of tax returns where no showing of relevancy had been made, recognizing our previously expressed "reluctance to allow uncontrolled and unnecessary discovery of federal income tax returns." *Hall v. Lawlis*, 907 S.W.2d at 494–5, citing *Sears*, 824 S.W.2d at 559.

We are similarly reluctant to allow unnecessary disclosure of a litigant's tithing records, which contain information of a highly personal and private nature and which in many cases may be a subset of a person's tax records. As we held regarding the forced production of tax records, where the irrelevant portions of which were not safeguarded from discovery, "[a] litigant so subjected to an invasion of privacy has a clear legal right to an extraordinary remedy since there can be no relief on appeal; privacy once broken by the inspection and copying ... by an adversary cannot be retrieved." *Maresca*, 362 S.W.2d at 301.[10] Therefore, under the particular circumstances here, Tilton's tithing records being wholly irrelevant, we believe that the *Walker* standard has been met. Accordingly, we grant Tilton's motion for leave to file the petition for writ of mandamus as to the requested production of documents, and conditionally grant the writ pursuant to Texas Rule of Appellate Procedure 122. If the trial court fails to reverse and vacate his discovery order compelling production of Tilton's religious tithing records, the writ will issue.

GONZALEZ, J., filed a concurring and dissenting opinion.

HECHT, J., joined by GONZALEZ, J., filed a concurring and dissenting opinion.

---

10. In *Walker*, we disapproved of *Crane* and other cases "to the extent that they imply that a remedy by appeal is inadequate merely because it might involve more delay or cost than mandamus." *Walker*, 827 S.W.2d at 842. Our opinion in *Maresca*, however, including our reliance

therein on *Crane*, makes clear that the inadequacy of remedy by appeal from the forced production of irrelevant tax records derives not from the relative cost or the delay, but from the invasion of a litigant's privacy.

ENOCH, J., joined by CORNYN and BAKER, JJ., filed a concurring and dissenting opinion.

GONZALEZ, Justice, concurring and dissenting.

My opinion of August 1, 1995 is withdrawn and substituted with the following opinion. I now join in the Court's opinion and judgment insofar as it grants the writ of mandamus.

In balancing the rights of the parties to this suit, Tilton's right to free exercise of religion prevails over the right of the plaintiffs to proceed with their lawsuit. The trial will significantly burden Tilton's free exercise rights, which are guaranteed by the First Amendment to the United States Constitution and article I, section 6 of the Texas Constitution. Moreover, while Tilton's practices are clearly on the fringe, I am concerned that allowing this case to proceed to trial is the first step down a slippery slope that ends with heresy trials in our courts. I therefore agree in full with Justice Hecht's concurring and dissenting opinion and write separately to articulate additional reasons why the writ should issue as to all causes of action.

Based on extensive pre-trial proceedings, we can predict with confidence how this case will unfold. After the plaintiffs put on their case in chief, Tilton will likely defend himself by testifying that his beliefs are based on the word of God as revealed in the Holy Scriptures and summarized in two documents, "Our Confession of Faith—Statement" and "Word of Faith Family Church and Robert Tilton Ministries—What We Believe." Tilton will assert that certain principles are central to his religious beliefs: that tithing and the making of "vows" or donations are "expression[s] of trust, obedience [and] devotion ... to the Lord," that "God wants His children to be prosperous and successful in every area of life ... both spiritually and materially," and that "prosperity is reached by obedience to the Word of God." As he did in his deposition, Tilton will declare his beliefs that "God responds to the prayers of the faithful and blesses the faithful with physical, spiritual, and financial prosperity" and that physical ailments and infirmities are healed through spiritual faith. No doubt Tilton will also quote and interpret many verses from the Scriptures as support for his beliefs.

As explained below, it is not merely a possibility but a certainty that litigating the plaintiffs' claims of fraud and conspiracy will impermissibly test the truth or falsity of Tilton's religious convictions. Notwithstanding this Court's admonitions to the trial court, there is no way to avoid inquiry into the truth or falsity of Tilton's assertions about God, the effect of prayer and donations, and the meaning of various verses of *The Bible.*

Consider the fraud theory of recovery. The elements of a fraud claim are: (1) the speaker made a material representation; (2) the representation was false; (3) when the speaker made the representation he knew it was false or he made it recklessly without any knowledge of its truth or falsity; (4) the speaker's intention was that the other party should act upon the representation; (5) the other party acted in reliance upon the representation; and (6) the other party was injured. *T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d 218, 222 (Tex.1992). To prove their fraud claims, the plaintiffs thus must establish that the statements on which they base their claims were false. As the Court describes the plaintiffs' pleadings, Tilton knowingly and falsely represented that he would read their prayer requests, that he would "touch" them and their "vows" or donations, and that he would pray that their prayers be answered. In some Christian denominations, these representations could mean reading a summary of prayer requests without actually seeing the prayer requests themselves, touching without physical contact, or touching a mass of prayer requests and praying. This law suit will thus be transformed into a trial on doctrinal or theological differences between denominations.

Moreover, the Court truncates the basis for the plaintiffs' fraud claims. The plaintiffs have not pleaded fraud simply because Tilton did not read, touch, and pray over their letters and donations. Rather, the substance of their fraud claim is that because Tilton did not do what he said he would do, God did not

help them.[1] Tilton represented that he would take certain actions and that, because he was a "prophet of God" to whom God would speak about each supplicant, God would answer their prayers. The plaintiffs' counsel characterized the fraud claim in precisely these terms at oral argument.

In attempting to prove the falsity of Tilton's representations, the plaintiffs recognize that they cannot avoid delving into the truth of God's role in what Tilton promised. Their counsel stated when questioned:

A So he gets all of these people out here to start sending their money in under the representations that he has made, and then it doesn't happen.... Because if he is a prophet of God as he says he is, and these things he says are true and correct ... and the miracle didn't happen, so this man is a con artist and a fraud.

. . . .

Q He just says he is going to ask God to do these things. But he doesn't make a commitment on God's behalf that it will take place?

A Nobody needs a guarantee from a prophet of God.

Q And that's what the case is about?

A Right.

. . . .

Q Counsel, I am still confused about the extent to which you are going to try Mr. Tilton's personal faith and his subjective belief. You said here today in response to questions that the sincerity of his belief is an issue in this case. You have told us that, have you not?

A I said that I think we are entitled to look at that issue.

Q But on page 4 of your brief to this court, you said that opposing counsels have blatantly misstated and mischaracterized your claims and position. "Plaintiffs do not question Tilton's sincerity of religious belief, but rather question whether Tilton even considers his conduct to be of a religious nature." Do you stand by this distinction that's in

footnote 5 of your brief? What is that distinction?

A No, I don't stand by it. I didn't write it, and I don't stand by it. . . .

Clearly the plaintiffs fully intend to have a jury determine whether Tilton's beliefs are true or false. Although at one point the plaintiffs' counsel denied that the issue for trial was whether Tilton "is in fact a prophet of God," his explanation proves the contrary: "I am saying he [Tilton] is making false misrepresentations ... he is gaining their confidence by telling these people he is a prophet of God." Adjudging whether Tilton's representations were true or false would draw the jury inexorably into deciding whether he is truly a prophet of God who spoke for God on whether the plaintiffs' prayers would be answered. Clearly, secular courts can neither competently nor constitutionally determine the truth or falsity of promises about what God will do. The United States Supreme Court has concluded as much, writing that civil courts should exercise no jurisdiction in matters which concern "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them...." *Watson v. Jones,* 80 U.S. (13 Wall.) 679, 733, 20 L.Ed. 666 (1871); *see also Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 723, 96 S.Ct. 2372, 2387, 49 L.Ed.2d 151 (1976) (expressing the general rule that "religious controversies are not the proper subject of civil court inquiry").

As further evidence that trial of the fraud claims will necessarily involve determining the truth or falsity of religious doctrine, I draw the Court's attention to the probable jury charge. It will inquire, "Did Tilton commit fraud against the plaintiffs?" and will instruct that fraud includes the making of a "material misrepresentation." 4 STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES PJC 105.01–.02 (1990). Under the facts of this case, the jury will also likely be instructed that Tilton made misrepresentations if he made a "false statement of fact," a "promise of future performance made with an intent not to perform as promised," a "statement of

---

1. It is possible that God answered the plaintiffs'

prayers but that they did not like His answer.

opinion based on a false statement of fact," or an "expression of opinion that is false, made by one claiming or implying to have special knowledge . . . superior to that possessed" by the plaintiffs and to which the plaintiffs "did not have equal access." *Id.* at PJC 105.021A-.021C, PJC 105.021E.

To proceed to trial under the facts of this case will substantially burden Tilton's right to free exercise of religion. The First Amendment to the United States Constitution and article I, section 6 of the Texas Constitution afford broad protection to the free exercise of religion.[2] The judiciary may not inquire into the "truth or verity of . . . religious doctrines or beliefs." *United States v. Ballard,* 322 U.S. 78, 86, 64 S.Ct. 882, 886, 88 L.Ed. 1148 (1944). Hence, no claim of fraud may be made if it rests on a representation of religious doctrine or belief, even if the statement was insincerely made. *See Van Schaick v. Church of Scientology of Cal., Inc.,* 535 F.Supp. 1125, 1142–43 (D.Mass. 1982); *Molko v. Holy Spirit Ass'n for the Unification of World Christianity,* 46 Cal.3d 1092, 252 Cal.Rptr. 122, 762 P.2d 46, 58 (1988); *Christofferson v. Church of Scientology of Portland,* 57 Or.App. 203, 644 P.2d 577, 598 (1982); Weiss, *Privilege, Posture and Protection: "Religion" in the Law,* 73 YALE L.J. 593, 607 (1964) (stating that, if allowed, courts' adjudications of the truth or falsity of religious doctrines or beliefs result in "heresy trials"). Upon the proper facts, undoubtedly a religious leader may be held accountable for fraud, the same as any other defendant. But when allegations of fraud require the jury to pass judgment on whether matters of religious faith are true or false, no court can resolve the issues without impinging on religious freedoms.

I lastly consider the plaintiffs' causes of action against Tilton for civil conspiracy. I agree with the Court that a conspiracy claim is derivative because liability can arise only if a defendant or a co-conspirator participated in underlying unlawful acts. 925 S.W.2d at 681. In this case, the unlawful overt acts that the plaintiffs have alleged were that Tilton participated in defrauding them and in intentionally inflicting emotional distress on them. Thus, to prove their civil conspiracy claims, the plaintiffs must again show the elements of the underlying torts, plus that Tilton personally participated in them. As they must with the claims for fraud, the plaintiffs will have to persuade the jury that Tilton made false statements. As explained above, inquiring whether Tilton made false statements requires a judgment on the truth or falsity of religious beliefs and convictions. Such inquiries are constitutionally impermissible.

Proceeding to trial is an irremediable abuse of discretion which we should avert by issuing a writ of mandamus. Despite the Court's admonitions, there is no way to avoid turning this case into a heresy trial that will have a chilling effect on the free exercise of religion in this state. By denying Tilton's petition for a writ of mandamus and allowing this trial to proceed, the Court opens the door to governmental intrusion into the personal religious beliefs of our citizens.

For these reasons and those in Justice Hecht's opinion, I would grant Tilton's petition for writ of mandamus in all respects.

HECHT, Justice, joined by GONZALEZ, Justice, concurring in part and dissenting in part.

The Court's significant change in position on rehearing requires that I withdraw my prior dissent and substitute this opinion in its place. I now join in the Court's opinion and judgment except only insofar as they deny mandamus relief. Specifically, I join in all of the Court's opinion except the first paragraph of Part I–C, the first paragraph of Part I–D, and all of Part I–E but the last sentence.

---

**2.** The Texas Constitution provides:

All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences. No man shall be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent. **No human authority ought, in any case whatever, to control or interfere with the rights of conscience in matters of religion,** and no preference shall ever be given by law to any religious society or mode of worship. . . .

TEX. CONST. art. I, § 6 (emphasis added).

Word of Faith World Outreach Center Church, a non-denominational congregation of several hundred people in North Dallas who profess the Christian faith, and Word of Faith's principal pastor, Robert Tilton, are about to stand trial on claims of fraud, intentional infliction of emotional distress, and conspiracy to engage in this tortious conduct, brought by plaintiffs who gave Word of Faith money based on Tilton's unfounded assurances that if they did, God would answer their prayers. That, according to plaintiffs' trial counsel's statements to this Court, and what I also think is the fair import of plaintiffs' pleadings, is the pending case in a nutshell.

From the extensive evidence developed through discovery contained in the record before us, it seems to me that plaintiffs ought to be able to prove without much difficulty that Tilton made misrepresentations to them. There is hardly any dispute, for example, that Tilton promised if prayer requests were sent to him accompanied by monetary contributions, as plaintiffs' were, he would touch them, read them, and pray over them, and God would answer them. Tilton never touched plaintiffs' prayer requests (except, he says, in a spiritual sense), or read them (he sometimes read summaries of requests, which could have included plaintiffs'), or prayed over them (he prayed over mounds of requests *en masse,* but seldom over any individual request by itself). And if God ever answered them, it was not the answer plaintiffs wanted. In short, plaintiffs rather plainly did not receive what Tilton appeared to promise.

But in this country religion and its adherents cannot be held to all their promises in a court of law. Statements of belief, or hope, or even promise, when they have an essentially religious as opposed to purely secular character, are protected by the Free Exercise Clause of the First Amendment to the United States Constitution. Justice Douglas' simple observation half a century ago has become an aphorism of Free Exercise Clause law: "Men may believe what they cannot prove." *United States v. Ballard,* 322 U.S. 78, 86, 64 S.Ct. 882, 886, 88 L.Ed. 1148 (1944). It goes without saying that they may urge others to believe as well, without threat of civil liability. One who finds that the promise of faith rings hollow may not recover damages from the promisor. It is among the most fundamental tenets of our law that people "may not be put to the proof of their religious doctrines or beliefs." *Id.*

Not every statement made in the name of religion is entitled to this protection. A cleric has no more right than an agnostic to market the Brooklyn Bridge simply because he believes in faith he owns it. Unfortunately, few examples are so obvious. Along the full spectrum of experience, distinctions between what is protected and what is not are often blurred, as in the case now before us. All of the Members of the Court agree that some of plaintiffs' claims cannot be tried without abridging the Free Exercise Clause. We disagree on two very difficult matters: whether all of plaintiffs' claims are barred, as opposed to only some of them; and whether the district court, which has repeatedly refused to dismiss the claims that are barred, should now be directed to do so. If, as I think, the essential element all plaintiffs' claims share is that Tilton misrepresented what God would do, then those claims are barred, and the district court should be directed to dismiss them. This is the fundamental issue the Court must decide.

Tilton also complains that the district court has ordered him to produce his personal tithing records, which plaintiffs contend will show that Tilton is not only a fraud but a hypocrite—that he does not practice what he preaches. If one could be sued for being a hypocrite, there would be considerably more litigation. This contention, too, is not in my view one which can be tried to a jury consistently with the First Amendment.

I agree with the Court that the district court should be directed to dismiss plaintiffs' claims of intentional infliction of emotional distress and conspiracy to commit this tort, and to vacate its order requiring production of Tilton's personal tithing records. To the extent the Court grants mandamus relief, I therefore concur in its opinion and judgment. I also agree that some of plaintiffs' fraud claims cannot be tried, but unlike the Court, I do not think that *any* fraud claims can be

tried. Hence, I respectfully dissent from the Court's denial of mandamus relief.

## I

The pending litigation was originally filed by four plaintiffs: Patsy High and her common law husband Curtis High; Andrea Johnson; and Mary Elizabeth Turk. Turk is now deceased, and two representatives of her estate, Dr. Toni R. Turk and Vicki Crenshaw, have been substituted as plaintiffs. Three of the seven originally named defendants are relators in this mandamus proceeding: Word of Faith World Outreach Center, Inc., once a Texas nonprofit corporation with Tilton as president, but now dissolved; Word of Faith World Outreach Center Church, an unincorporated religious organization and successor to the nonprofit corporation; and Robert Tilton, Word of Faith's principal pastor. Four defendants have not joined in this proceeding: Marte Tilton, Robert's former wife; J.C. Joyce, an Oklahoma attorney who holds a management and administrative position with Word of Faith; Response Media, Inc., an Oklahoma corporation allegedly employed by Word of Faith to provide mass marketing strategies and services; and Internal Data Management, Inc., an Oklahoma corporation which allegedly handles the mail sent to Tilton and Word of Faith.

Plaintiffs have asserted three tort claims: fraud, intentional infliction of emotional distress, and conspiracy to commit these two torts. They all claim they are entitled to recover the money they contributed to defendants, damages for mental anguish, and punitive damages. Before examining how each of these claims is affected by relators' First Amendment defense, I recap plaintiffs' allegations in some detail.

## A

Plaintiffs' amended pleadings contain the following allegations.

Defendants are responsible for two television programs hosted by Tilton, *Sunday Morning Live,* a broadcast of church services, and *Success 'N Life,* an "info-ad" program shown throughout the week and more than once daily in some areas. Both programs are devoted largely to Tilton's urging viewers to send money based on representations that those who do will receive benefits from God including financial prosperity and good health. Viewers are encouraged to call a "prayer line" telephone number to make a "seed of faith" monetary vow. Operators answering this line take information from callers which is entered into computers and used for Word of Faith mailings. Defendants' broadcasts and mailings include testimonials of individuals identified only by their first names, who claim to have obtained great wealth, new cars, houses, good jobs, and medical healing, all as a result of having "seeded their faith" by contributing money to Tilton and Word of Faith.

Mailings are form letters and brochures composed and produced to appear to be personal messages from Tilton to the individual recipients. Often enclosed with these mailings are forms which recipients can return to defendants with prayer requests noted and monetary contributions included; weekly invoices showing the amount of vows made, amounts paid, and amounts still owed on vows; and forms and envelopes for making and sending contributions. Other items, such as books, tape recordings, literature, calendars, and prayer cloths, are also mailed. The primary message of all mailings, like the broadcasts and "prayer line", is the need to send money.

To acquire credibility and induce people to contribute money, Tilton claims to be a prophet of God. (Actually, plaintiffs allege, in an apparent attempt at humor: "Robert Tilton represents that he is a profit of God.") Tilton constantly represents that if a prayer request is returned with a contribution, then in the words of plaintiffs' pleadings, "Robert Tilton will personally and actually read, touch and pray over each of these requests and . . . thereby, the one making the vow and request will receive whatever is requested." In broadcasts Tilton is shown praying over actual prayer requests.

Patsy High began watching Tilton's broadcasts soon after her family had taken physical custody of her four children from her. Distraught, she came to believe that Tilton had the power to help her regain custody of

the children, and that he would do so if she contributed money to him. The day after she called the "prayer line" and made a $100 vow, she was watching a *Success 'N Life* broadcast when she heard Tilton say that a person watching the broadcast was experiencing family problems and should call the "prayer line" to make a vow to have her family restored. Tilton said that $100 was not sufficient and implied that at least $1,000 was required. Tilton said that people who were robbing God by holding back on their seeds and not sending enough money would not receive what they requested. Convinced that Tilton was talking directly to her, Patsy made an additional vow of $900. The Highs lacked the financial means to pay this amount, but Patsy believed Tilton's assertion that the money would somehow become available.

Curtis High was initially unsure about Tilton's ability to have Patsy's children returned to her. When Patsy reported this to "prayer line" operators, they told her that Curtis' lack of faith in Tilton was preventing the return of her children, and that the devil was using Curtis. At the urging of "prayer line" operators, Patsy insisted that Curtis attend Word of Faith services with her, and he did. Both joined Word of Faith and over time contributed over $15,000. Plaintiffs allege that defendants continually told them to "stay strong, have faith, and continue paying vows and your children will be returned to you." Once when Patsy was suffering from headaches, Tilton personally prayed with her over the telephone and told her she was cured. Her headaches, however, did not go away.

Tilton sent the Highs a prayer cloth, instructing them to cut it into small pieces and sew it into clothing sent to the children so that they would be returned. Tilton also asked for photos of the children to pray over. The Highs complied with all of these instructions, but their children were not returned. After the Highs had sent defendants all the money they had, they asked Word of Faith for food and help and were turned away.

Andrea Johnson is physically disabled. After watching defendants' broadcasts daily for a week, she became convinced that she could gain physical and moral strength and financial security by contributing money to Tilton. She called the prayer line and made a vow, began receiving mailings, and eventually joined Word of Faith. When she expressed doubts about her ability to continue making contributions, defendants told her to stand in faith. Johnson used state welfare money to make contributions and even sent defendants food stamps, which they accepted. Johnson never obtained the financial security or physical healing she was promised and eventually became depressed and suicidal.

Mary Elizabeth Turk's representatives claim that Turk began watching Tilton's broadcasts while she was caring for her ailing husband. She became convinced that Tilton had the power to heal her of any illness and free her from physical pain if she contributed money to him. After her husband died, she began suffering excruciating pain but refused to seek medical treatment. In reliance on Tilton's promises, she made a vow of $1,000, believing she would be healed. Turk received a prayer cloth from Tilton which he said he had "anointed", and she was instructed to place the cloth over the affected area of her body to be healed. She did so, but did not get any relief. Turk put off seeking medical help until she developed severe gangrene and fatal rectal cancer. Before her death she gave Tilton about $1,453.

Tilton did not do what he promised. He had no intention of handling plaintiffs' prayer requests as he said he would, and he knew that he could not control whether plaintiffs would ever receive what they wanted. He made misrepresentations to plaintiffs solely to induce them to contribute to him and Word of Faith. This is what plaintiffs plead.

**B**

Plaintiffs allege that defendants acted in bad faith. They stress in their amended petition: "Plaintiffs do not base the allegations herein on the religious faith and/or beliefs of the Defendants, but base the allegations on the specific acts and misrepresentations of the Defendants which are secular acts and practices." To summarize plaintiffs' lengthy pleadings, they complain that Tilton misrepresented to them—

- that he would read, touch and pray over individual prayer requests when he did not do so and had no intention of doing so;
- that God had spoken to him about specific people when Tilton admitted that God only spoke to him in a general sense;
- that he had personally touched, prayed over or anointed various articles, such as prayer cloths, to imbue them with special power, when he had not done so and the articles possessed no special power;
- that he could perform miracles when he could not do so; and
- that if they would contribute money to him, God would answer their prayers and give them financial prosperity, good health, and other rewards.

In briefs in this Court, plaintiffs have described their claims more succinctly: "Patsy High ... believed that if she sent in her money and her prayer requests to Tilton that Tilton would actually and physically touch, read, and pray over her prayer requests and that because Tilton would do these things, she would regain physical custody of her children." "Ms. Johnson paid on her vows, believing that if, and only if, she made and paid monetary vows to Robert Tilton and only because Robert Tilton would physically touch, read, and pray over her prayer requests that were to be included with their payments made on the vows, she would become financially independent." "Mary Turk believed in Tilton, she made her vows to Tilton and sent in her money along with her prayer requests, believing that Tilton would do the things that he promised and that she would thereby be healed." In each instance it is important to note that plaintiffs did not understand Tilton to say that he could himself fulfill their desires, only that he could move God to do so. Plaintiffs all wanted something—their children, financial security, health—that they looked to God to give, but they believed Tilton's representations to them that if they contributed money for his personal intervention, God was more likely to act.

As a practical matter, of course, if not a legal one, had plaintiffs' prayers been answered to their satisfaction they would have had nothing to sue over, as plaintiffs' counsel conceded at oral argument. Asked, "if the prayers of your clients had been answered in the manner in which they wished those prayers to have been answered, you would not be here today?" plaintiffs' counsel answered, "I would have to say it is probably true." Still, plaintiffs contend: "The issue herein is not whether or not God answered the Plaintiffs' prayers, it is whether or not Robert Tilton used the false promise that if the Plaintiffs would send enough money to Tilton, he would do certain things in relation to Plaintiffs' prayer request, and that because Tilton would do these things, the Plaintiffs would receive whatever they asked for in their prayer requests." This characterization of the legal issue before us, which I think is accurate, becomes crucial in analyzing the effect of the Free Exercise Clause. The issue is not whether Tilton made meaningless promises—to touch, to read, to pray, to anoint—that he did not keep, or even that he did not intend to keep; the issue is whether, had Tilton kept those promises, God would have given plaintiffs what they wanted, and because Tilton deceived plaintiffs, their prayers went unheeded. The issue is not whether God answered plaintiffs' prayers; the issue is whether God would have given plaintiffs what they asked for if Tilton had done what he said he would do.

## II

That issue cannot, in my view, be litigated as a fraud claim. Both the liability and the damages components of such a claim impinge on defendants' Free Exercise Clause rights.

## A

I agree with the Court that the First Amendment does not permit trial of a claim which turns on the veracity of a religious belief. I do not agree, however, that plaintiffs' fraud claims fall into two categories. The claims which the Court describes as involving "Tilton's allegedly insincere representations of religious doctrine or belief", *ante* at 678, are clearly barred by the Free Exercise Clause. But the "representations that he would perform certain concrete acts",

*ante* at 679 —e.g., touching and reading prayer requests—are likewise barred. The distinction for the Court is that while Tilton cannot be required to prove in court that the Holy Spirit actually prompted him as he said, he can be required to prove whether he touched or read a prayer request when he said he would. I agree that this distinction can be made, but I do not agree that it is pertinent in applying the Free Exercise Clause.

Plaintiffs did not seek Tilton's personal attention to their prayer requests as one might seek a celebrity's autograph. They believed that only God could give them what they wanted. They saw Tilton, not as god, but as a means of enhancing their access to God. Their contributing money to him, his handling of their prayer requests, their use of articles he said he had anointed with special power—all of this was to make it more likely that God would grant their petitions. I agree with the Court that whether their contributions or use of special articles really mattered to God is not something that can be tried in court. By contrast, whether Tilton actually read a prayer request when he said he would is an issue which can easily be tried, but it is not dispositive of the case. To prevail on their fraud claim, plaintiffs must still prove that if Tilton had actually read their requests, God would have granted them, and because he didn't, God didn't. Otherwise, Tilton's misrepresentations about what he would do are meaningless and could not have caused plaintiffs injury.

Suppose Tilton had told plaintiffs he would read their requests in the morning because God is especially attentive to morning prayers, and in fact he did not do it until evening. This failure to do what he promised would clearly not render him liable for damages unless it caused injury, unless reading prayer requests in the morning really was important in getting God to answer them. What Tilton did or did not do can be proved; the significance of his actions cannot be. Since it cannot be proved whether God was less likely to grant plaintiffs' prayer requests because Tilton did not touch or read or pray over them personally as he said he would, or because he did not personally touch prayer cloths as he promised, Tilton's failure to do these things cannot be determined to have caused plaintiffs' damages.

Had plaintiffs contributed to Tilton solely to obtain his personal services or attention, I would agree that his failure to perform as promised would be actionable. Had Tilton promised personal counseling or literature or some other service or thing in exchange for contributions, then he could be liable for failing to perform. Had Tilton falsely promised he would dedicate contributions to certain purposes, contributors who relied on that promise might be entitled to their money back. But none of these situations are involved here. Tilton promised that God would give his contributors what they wanted, and he would assist in assuring it. The record seems rather clear that Tilton's promise failed on both counts, and if that were proven, as it probably could be, plaintiffs would make out a case of fraud. They cannot recover, however, because Tilton's promise remains the kind of religious statement that is protected by the Free Exercise Clause.

Part of the nature of most religions in general is to hold out to those who respond the hope that they will receive in return— whether it be redemption, forgiveness, blessing, peace, truth, happiness, health, or prosperity. For those for whom that hope fails the law does not afford recompense; otherwise, religious believers would be discouraged from freely stating their beliefs. The Free Exercise Clause protects even the more outrageous claims of religion. In the words of *Ballard:*

> The religious views espoused ... might seem incredible, if not preposterous, to most people. But if those doctrines are subject to trial before a jury charged with finding their truth or falsity, then the same can be done with the religious beliefs of any sect. When the triers of fact undertake that task, they enter a forbidden domain.

322 U.S. at 87, 64 S.Ct. at 886. Tilton's interest in money may be unusually unabashed, his tactics in raising it may be unusually offensive, and his promises as to what God will do may be extraordinarily far-

fetched. He may be exactly what plaintiffs say he is: a sham and a fraud. But his statements are nevertheless essentially religious beliefs for which he is protected from liability.

Tilton is not protected because he is a pastor or because he has simply invoked the name of religion. A promise of a purely secular nature—that contributions would be used to buy contributors new cars—is not shielded from legal enforcement, regardless of who makes it. While the line between what is religious and what is secular is not always a bright one, I think Tilton's statements are rather clearly on the religious side.

Some were, at least, even if not all of them. The Court agrees yet affords no relief. Its uneasiness in allowing all plaintiffs' fraud claims to proceed is conspicuous:

> We cannot conclude that Tilton's constitutional rights will be violated by this suit, however, because we cannot determine on this abbreviated record exactly which of Tilton's representations plaintiffs will rely upon to prove their claims of fraud.... The dynamic nature of the trial process makes it imprudent for us to structure the trial based on such an abbreviated record. While plaintiffs' counsel at oral argument before us made several statements that indicated a present intent to proceed on inappropriate theories, we are loath to substitute these comments for a factually developed record. Hence, we do not hold that the trial court has erred to such an extent that correction by extraordinary writ is justified.

> Nevertheless, we caution that a failure by the trial court to carefully consider each of the alleged misrepresentations on which plaintiffs base their fraud claims may irreparably violate Tilton's constitutional rights. The trial court must identify those statements upon which plaintiffs' fraud claims are based, determine which ones, if any, involve religious doctrines or beliefs, and ensure that the trier of fact does not hear evidence regarding them or pass on their veracity.

*Ante* at 680. In other words, while plaintiffs' pleadings assert claims barred by the Free Exercise Clause, and plaintiffs' counsel has assured us that he intends to prosecute those claims, this Court is unable to provide defendants the protection promised by the Constitution. The responsibility for affording such protection, according to the Court, lies entirely with the district court, and by this pronouncement the Court attempts to wash its hands of the case. But the reason the parties are here is because the district court has already passed on the issues; the district court has repeatedly—at least four times—refused to dismiss plaintiffs' claims, and the case is on the brink of trial.

Given the Court's view that it will "irreparably violate Tilton's constitutional rights" for the district court to allow "the trier of fact" to "hear evidence" on barred claims or "pass on their veracity", the only remedy remaining for relators is to seek mandamus a third time. The parties should note well that the Court neither prohibits nor discourages another application for mandamus if plaintiffs' claims proceed to trial. The Court apparently envisions that if the district court orders Tilton to testify whether he believes the statements he made to plaintiffs, the trial will stop while the parties reapply for mandamus to prevent an irreparable violation of their rights, although I suspect that the Court prays that somehow it will never come to that. The better course, it seems to me, is to give relators the relief to which they have already shown themselves entitled.

**B**

The flaw in the Court's fraud analysis is also apparent in its discussion of damages plaintiffs may recover. Citing three lower court decisions, two of which were never reviewed by this Court, the Court announces that "the measure of damages in a fraud case is the actual amount of plaintiff's loss that directly and proximately results from the defendant's fraudulent conduct." *Ante* at 680. While it is true in a very general sense that a defrauded plaintiff is entitled to be made whole, this superficiality is hardly an accurate restatement of the measure of fraud damages.

Damages recoverable for fraud are compensatory, consequential and punitive. Compensatory damages are measured two ways: either as the difference between the value given by the plaintiff and the value received, called "out-of-pocket" damages, or as the difference between the value promised and the value received, called "benefit-of-the-bargain" damages. *Leyendecker & Assocs. v. Wechter,* 683 S.W.2d 369, 373 (Tex.1984). Consequential damages are other losses occasioned by the fraud. *See, e.g., Trenholm v. Ratcliff,* 646 S.W.2d 927, 933 (Tex.1983)(lost profits). Punitive damages, as in other cases, are awarded for willful, egregious conduct. *Dennis v. Dial Finance & Thrift Co.,* 401 S.W.2d 803, 805 (Tex.1966).

In this case, compensatory damages cannot be recovered because there is no way to determine the value of what plaintiffs received. The undisputed evidence is that Tilton prayed for plaintiffs generally. Assuming that what Tilton did was worth less than what he promised—reading plaintiffs' prayer requests, touching them, and praying for plaintiffs specifically—it is impossible to say how much less. The Court properly prohibits recovery for unanswered prayers, but it does not address how compensatory damages can ever be determined in this case. The jury in this case will be asked to find the difference between the value of what was either given or promised and the value of what was received. The jury could find that the value given was equal to the contributions made, but it cannot put a value on what was received.

The Court specifically approves recovery of *pecuniary* consequential damages, although the pleadings do not allege any such damages. The only consequential damages plaintiffs allege are for mental anguish. The Court properly would not permit plaintiffs to recover damages for mental anguish. To allow mental anguish damages or punitive damages against defendants in this case would be to chill defendants free exercise of religion. A person can hardly exercise his religion freely, knowing that he may someday be required to pay mental anguish or punitive damages.

Fraud may also vitiate a transaction, supporting rescission. I find it difficult to characterize the relationship between plaintiffs and Tilton as a transaction—payments of money in exchange for prayers and other things. But assuming that it was, plaintiffs are not as a rule entitled to rescission unless they can prove that the value of what they received was less than they were promised. *Moore v. Cross,* 87 Tex. 557, 29 S.W. 1051, 1053 (1895). Again, it is impossible to assess the value of Tilton's prayers. Indeed, one might even argue that God, to whom plaintiffs prayed, would bless them for the contributions they made to Tilton irrespective of what Tilton did in return. The Court's blithe statement that plaintiffs may be entitled to their money back simply overlooks the difficulties in awarding damages in these circumstances.

### III

I agree with the Court that plaintiffs' claims for intentional infliction of emotional distress cannot be tried. Because plaintiffs' claims for fraud and intentional infliction of emotional distress should be dismissed, it follows that their conspiracy claims must also be dismissed.

Having concluded that plaintiffs' claims are barred by the First Amendment, I need not consider whether Tilton and Word of Faith are afforded greater protection by article I, section 6 of the Texas Constitution, which provides in pertinent part:

> All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences.... No human authority ought, in any case whatever, to control or interfere with the rights of conscience in matters of religion....

The Court, however, is obliged to consider this alternative basis for relief. It refuses to do so on the ground that it is "reluctant to decide an issue as important as the scope of the Texas Constitution's free exercise guarantee under these circumstances." *Ante* at 677 n. 6. The sole "circumstance" referred to is Tilton's failure to brief the factors involved in construing a constitutional provision. *Id.*

The Court disregards its recent insistence that state constitutional provisions be construed and applied before considering related provisions of the federal constitution. *Davenport v. Garcia*, 834 S.W.2d 4, 11–21 (Tex. 1992). Inadequate briefing is no impediment to consideration of Tilton's contentions on state constitutional grounds. The Court stated in *Davenport:*

> Our consideration of state constitutional issues is encumbered when they are not fully developed by counsel. Many of our sister states, when confronted with similar difficulties, have nevertheless decided cases solely on state grounds or ordered additional briefing of the state issue. We will follow this procedure as necessary and appropriate, when asserted state grounds have not been adequately briefed.

*Id.* at 20–21. I seriously doubted whether the Court meant what it said in *Davenport.* Today's decision is proof that it did not.

### IV

Given that defendants' First Amendment rights will be impaired by a trial of at least some of plaintiffs' claims, the position in JUSTICE ENOCH's dissenting opinion that mandamus should not issue to protect against this infringement can hardly be taken seriously. If Tilton were about to lose his interest in maintaining the confidentiality of a privileged document, we would grant mandamus because "the appellate court would not be able to cure the trial court's discovery error." *Walker v. Packer*, 827 S.W.2d 833, 843 (Tex. 1992). " 'After the [privileged documents] had been inspected, examined and reproduced ... a holding that the court had erroneously issued the order would be of small comfort to relators in protecting their papers.' " *Id.* (citing *Crane v. Tunks*, 160 Tex. 182, 328 S.W.2d 434, 439 (1959)). Defendants' interest in not standing trial for their religious beliefs, a right guaranteed by the Constitution, should be afforded at least as much protection as a claim of evidentiary privilege.

Mandamus will issue to require arbitration rather than allow the parties to go to trial, even though the error could be corrected on appeal. *Jack B. Anglin Co. v. Tipps*, 842 S.W.2d 266, 272 (Tex.1992). Mandamus will issue to set aside gag orders which infringe on freedom of speech. *Davenport v. Garcia*, 834 S.W.2d 4 (Tex.1992); *Grigsby v. Coker*, 904 S.W.2d 619 (Tex.1995) (per curiam). It will issue to transfer venue in cases involving children. *Proffer v. Yates*, 734 S.W.2d 671, 673 (Tex.1987). Surely the rights at stake in this case are every bit as important as the interests in these other settings.

JUSTICE ENOCH's dissenting opinion warns of "woe to the bench and bar", *post* at 695, because the Court now intends to review all denials of summary judgment by mandamus. This is simply not true. All denials of summary judgment do not threaten the irreparable loss of constitutional rights. If defendants are subjected to trial on claims which infringe on their protected free exercise of religion, it is of little consequence whether they win or lose, in the district court or on appeal. The Free Exercise Clause protects against being "put to the proof" of religious doctrines and beliefs. *Ballard*, 322 U.S. at 86, 64 S.Ct. at 886. That right, lost at trial, cannot be restored by a favorable jury verdict or vindication on appeal. Mandamus relief should not be denied because it means "jumping into this case prematurely". *Post* at 695. The record is no more limited in this case than it is in other original mandamus proceedings. In fact, it so happens that the issues here are rather fully developed and the case is ready for trial. The only significant means of completing the record is at trial, yet it is trial which threatens to deprive defendants of their rights.

\* \* \* \* \* \*

Tilton and Word of Faith are not sympathetic figures in my view. A convincing case can easily be made from the evidence produced in discovery that Tilton and Word of Faith took advantage of plaintiffs' misfortunes to deceive them with false hopes and deprive them of their meager resources. If protection under the Free Exercise Clause extended only to the deserving, it would probably not reach Tilton and Word of Faith. It does, however, because as important as the State's interest is in protecting its citizens from fraud, its interest in preserving religious freedom is far more important.

Each week the religious communities of this country promise a nobler, better world, and more besides, if only people will respond. Usually they also ask for financial support—perhaps not as greedily as Tilton, but they ask all the same. I agree with the Court that the First Amendment does not require them to prove the promises they make of a religious nature. But as I believe that is what defendants are being compelled to do in this case, I would direct the district court to dismiss plaintiffs' claims.

Accordingly, I respectfully dissent.

ENOCH, Justice, joined by CORNYN and BAKER, Justices, concurring in part and dissenting in part.

This matter is here on petition for writ of mandamus. Because mandamus is inappropriate, I would deny all relief. Consequently, I concur in the partial denial of relief but dissent from the Court's judgment granting mandamus relief.

I think it is safe to say that the members of this Court believe that the trial court should have granted summary judgment, at least in part, in this case. The Court's acting on that belief troubles me in several significant respects. First, up until now, this Court has never held that mandamus is available to review the denial of a motion for summary judgment. Second, to review the plea to the jurisdiction, the Court has to directly overrule its own precedent. Most importantly, the Court justifies its holding with the bald implication that the First Amendment right to free exercise of religion is more important than other constitutional rights.

There is good reason for not reviewing the denial of summary judgments on petitions for writ of mandamus. This case is it, and woe to the bench and bar. The solution wrought by the Court today must certainly leave the parties and the trial court slack-jawed. How the trial court is to proceed through the minefield laid in this Court's opinion and try only certain limited claims of fraud and not others, to admit evidence only pertinent to those limited claims, and even then for limited purposes only, and to ensure that Tilton's free exercise rights are never implicated in

the slightest, is unexplained and inexplicable. I suggest this is the only possible result because the Court has an incomplete record and, consequently, can only fashion a holding by guessing about what the future record will be.

Regarding the plea to the jurisdiction, we have specifically held that the denial of such a plea is not reviewable by mandamus. *Bell Helicopter Textron, Inc. v. Walker*, 787 S.W.2d 954, 955 (Tex.1990). The Court explains neither why it was wrong a mere six years ago nor why it overrules *Bell Helicopter* today.

As for why the Court jumps into this case at this stage of the proceedings, it gives no reason other than an implication that free exercise of religion is relatively more important than other rights. Without explanation, the Court notes that mandamus "may not be appropriate in every case in which constitutional rights are impaired," but it is in this case. 925 S.W.2d at 682. I see no principled basis for elevating free exercise rights above others.

Consider free speech rights. The courts may be called upon to intercede in favor of free speech in cases involving prior restraints. *See Davenport v. Garcia*, 834 S.W.2d 4, 10–11 (Tex.1992) (mandamus granted in part to vacate trial court's gag order). But a prior restraint of speech involves direct government infringement of the freedom to speak. In this case, the state is acting through the courts only indirectly, and only as a referee, an arbiter of disputes between private parties, all of whom have interests they seek to vindicate.

In jumping into this case prematurely, the members of this Court are forced into an unnecessary debate. We all agree that enduring a trial impinges on Tilton's First Amendment rights. But that's not the point. While arguing over whether the plaintiffs make viable claims in this case, neither the Court nor my dissenting colleagues argue that the Free Exercise Clause of the First Amendment grants clergy a license to defraud or inflict torts on others. Nor do they dispute that while the freedom to believe is absolute, the freedom to act, though based on

**696**

religious belief or arising in the context of religion, is not. *Cantwell v. Connecticut,* 310 U.S. 296, 303–04, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). Religious conduct is subject to regulation for the protection of society. *Id.* at 304, 60 S.Ct. at 903. My colleagues are merely arguing over the significance of the pleaded facts and the intent of the plaintiffs. A complete record would likely eliminate much of their discussion.

Furthermore, my colleagues agree that in refereeing personal injury actions in which the free exercise of religion is asserted as a defense, courts necessarily must balance a tension between remedying tortious injuries and protecting the free exercise rights of the defendant. We each acknowledge that this balance, because freedom of religion is so entrenched in our history and constitutional make-up, is precarious. The Court's opinion and my colleagues' dissents today simply are a testament to the difficulty of discerning the proper balance between the competing interests.

To be sure, sending certain matters to the jury may ultimately be improper. *See United States v. Ballard,* 322 U.S. 78, 87–88, 64 S.Ct. 882, 886–87, 88 L.Ed. 1148 (1944) (trial court properly withheld from jury all questions concerning the truth or falsity of the religious beliefs of defendants convicted of mail fraud). However, I reiterate, religious conduct is not per se exempted from regulation. The state has an interest in providing remedies to persons injured by the clergy's fraud or other tortious conduct. And while the trial court perhaps should have granted summary judgment on one or more of the plaintiffs' claims, the Court concedes that the trial court may try certain of the plaintiffs' claims without interference with Tilton's free exercise rights. Consequently, this case is going back for further proceedings, maybe even a trial. I do not understand why the Court chooses to hamstring the parties and the trial court by hastening to parse out in advance, and without a complete record, what may be tried and what cannot be broached in the slightest. The trial court is in the best position to determine, as the trial progresses, which areas of inquiry are proper and which are not, and what may be submitted to the jury and what may not. That is what trial courts do all the time.

My colleagues on this Court, in granting the extraordinary remedy of mandamus, rush to vindicate religious liberty, a liberty that exists only in balance with other liberties we enjoy. In the process, they ignore the Court's role as arbiter and run roughshod over other vital rights. I cannot join my colleagues in this effort. Tilton's free exercise rights may ultimately win, on balance, because of the record that evolves at trial. But mandamus in this case is not the vehicle by which this Court should strike that balance.

I would deny the petition.