Petition for Writ of Mandamus Conditionally Granted and Opinion filed
October 23, 2003















 

Petition for Writ of
Mandamus Conditionally Granted
and Opinion filed October 23, 2003.

                                                                                                                                                            

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-03-00572-CV

____________

 

IN RE ARTHUR ANDERSEN LLP, Relator

 

 



 

Original Proceeding

Writ of Mandamus

 



 

O P I N I O N

                                                I.  INTRODUCTION








This case relates to the financial demise of Enron
Corporation.  In August of 1999, Ken Lay,
President and CEO of Enron Corporation, visited the City of Brenham, Texas in  Washington County.  The purpose of his visit was to speak to the
Washington County Chamber of Commerce at its annual dinner and tout Enron as a
savvy investment.  This visit was widely
publicized in and around Brenham, both by the newspapers and radio.  The Plaintiffs,[1]
all potential investors in Enron, either attended the meeting and heard Lay
tell what a great investment Enron would be for them individually, for their
trusts, and for their employee pension plans, or heard about the meeting later.  Plaintiffs claim Lay=s statements to the group were
backed up by Enron=s quarterly and annual reports,
which indicated that Enron was rock-solid and highly profitable.  After investing, the Plaintiffs alleged they
would review press releases touting Enron=s financial strength and its
expected increases in profits. 

Lay had told the Plaintiffs and others that they would make
lots of money if they invested in Enron. 
They did make lots of moneyCfor awhile.  Then, their stock dropped precipitously.  In late 
2001, Enron filed for bankruptcyCat the time, the largest
ever.  Many of Enron=s top executives and some
officers were accused of illegal activities. 
Daily news reports indicated that the Justice Department was
investigating various Enron officials and investigating the accuracy of Enron=s financial reports.  Ultimately, several Enron officials were
indicted.

The Plaintiffs felt they had been betrayed.  They sued Ken Lay and two other Enron
executives, unknown before, but by then well known because of the Enron debacleCAndrew Fastow
and Jeffrey SkillingCand Arthur Andersen and five of
its partners.  

Andersen claimed it was just misled just like the
Plaintiffs.  It tried to join other
defendants, namely financial institutions, it claimed were at least partly, if not
totally, responsible for Enron=s demise.  These financial institutions, it claimed,
enabled Enron to engage in inappropriate financial deals that masked its
economic troubles; without these institutions the Plaintiffs= suit could not be litigated
fairly.

But the Plaintiffs claimed that the financial institutions
were irrelevant to the lawsuit.  They
claimed the suit was based on (1) Ken Lay=s misrepresentations made that
August evening in Brenham, (2) Enron=s quarterly and annual
financial reports prepared by Andersen, and (3) press releases and other public
announcements Enron made concerning its financial strength.  They claimed the financial institutions did
not misrepresent anything to them the day Ken Lay visited and that their causes
of action and petition did not implicate the financial institutions.








The trial court agreed with the Plaintiffs and in April
2003, denied Anderson leave to join the third parties.  In July 2003, the trial court also entered a
scheduling order that denied joinder of third
parties.

In this mandamus, Andersen asks us to hold that the
financial institutions are potentially responsible third parties who must be
joined, and to set aside the two orders denying joinder.  Finally, Andersen asks us to hold that it has
no adequate remedy by appeal.  Because we
agree on all three issues, we conditionally grant the writ of mandamus as to
the April 2003 order denying leave to join third parties and the July 2003
scheduling order.

                                                II.  BACKGROUND

We turn first to the historical facts.  The Plaintiffs sued Andersen[2]
and the other defendants[3]
for negligent misrepresentation, fraud, and conspiracy.  The allegations are extensive and complex,
and later we will discuss the relevant allegations in more detail.  However, in essence, the Plaintiffs allege
that the defendants provided false and misleading public information regarding
Enron=s financial condition,
prompting the Plaintiffs to buy and/or retain existing shares of Enron stock;
consequently, their retirement funds were diminished when Enron=s true financial condition was
eventually revealed and its stock devalued. 
In particular, the Plaintiffs complain that the defendants failed to
disclose Enron=s use of Aspecial purpose entities,@ which concealed Enron=s debt and caused its earnings
to be overstated.








The procedural history of the suit is complicated;
therefore, we will review only those events important to this appeal.  In January of 2002, the Plaintiffs filed
their original petition.  Several months
later, Andersen filed its original answer, and a month after that the
Plaintiffs filed a first amended petition adding new plaintiffs.  Then, in December of 2002,[4]
the Plaintiffs filed a second amended petition again adding new plaintiffs and
adding significant factual allegations.

Shortly after the Plaintiffs filed the second amended
petition, Andersen filed a motion for leave to join Michael Kopper,[5]
J.P. Morgan Chase,[6]
CSFB,[7]
CIBC,[8]
Bank of America,[9]
Barclays,[10]
Lehman Brothers,[11]
and Merrill Lynch,[12]
claiming that the Plaintiffs= new factual allegations and
public disclosures implicated these third parties in the transactions involving
the special purpose entities.

Shortly after this, in early 2003, Andersen answered the
claims of the new Plaintiffs in the first and second amended petitionsCreferring to them as Aintervening Plaintiffs.@  On the same day, Andersen filed its
third-party petition.[13]









A month later, the trial court sua
sponte severed into a separate suit[14]
the claims of the new Plaintiffs in the second amended petition and Andersen=s third-party petition.  In response to the severance, the Plaintiffs
filed a third amended petition to reflect the Plaintiffs left after the
severance order; the third amended petition contained essentially all the
greatly expanded factual allegations first raised in the second amended
petition.

The trial court held a hearing on Andersen=s motion for leave to join
third parties.  On April 29, 2003, the
court signed an order denying the motion. 
In mid-May of 2003, Andersen filed this mandamus petition and an
emergency motion to stay the underlying suit.

Meanwhile, the trial court had set trial for September 29,
2003.  However, discovery had previously
been stayed until April 24, 2003 by a federal court order.[15]  Therefore, despite  the pending mandamus petition, the parties
began discovery to prepare for the September trial.  On July 1, 2003, the Plaintiffs filed a
motion to extend the discovery period and a motion for entry of a Level 3 discovery
control plan.  At a July 8, 2003 hearing
on these motions, Andersen again attempted to join third parties by requesting
that any such discovery control plan include a deadline for joining additional
parties.  On July 15, 2003, the trial
court entered a scheduling order resetting the trial to November 10, 2003, and
setting various deadlines, but the court refused to set a deadline for adding
third parties.  In August of 2003, we
stayed the trial and discovery to allow us to consider the mandamus petition.

                               III.  MANDAMUS STANDARD OF REVIEW








Mandamus relief is available if the trial court clearly
abuses its discretion, either in resolving factual issues or determining legal
principles, and there is no other adequate remedy at law.  Walker v. Packer, 827 S.W.2d 833, 839B40 (Tex. 1992).  A trial court clearly abuses its discretion
if Ait reaches a decision so
arbitrary and unreasonable as to amount to a clear and prejudicial error of
law.@  Id. at 839.  However, as to legal issues, an error
amounting to an abuse of discretion can be as simple as misinterpreting or
misapplying the law.  See Triantaphyllis v. Gamble, 93 S.W.3d 398, 402 (Tex. App.CHouston [14th Dist.] 2002, pet.
denied)(citing Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241B42 (Tex. 1985).  Thus, to show abuse of discretion in
determining legal principles, the relator must show
the trial court failed to analyze or apply the law correctly.  See id; Walker, 827 S.W.2d at
840.  A trial court has no Adiscretion@ in determining what the law is
or applying the law to the facts.  Walker, 827 S.W.2d at 840.  Finally, the relator
must also show it has no other adequate remedy at law.  Id.

                                       IV.  THE ISSUES PRESENTED

Andersen contends that the trial court abused its discretion
by denying Andersen the right to join the third parties, and that it has no
adequate remedy at law.  It claims this
abuse of discretion is embodied in two orders: 

                 
the
April 2003 order denying leave to join third parties;[16]
and           

                  
the
July 2003 scheduling order denying joinder of
additional parties.[17]








The Plaintiffs claim these orders were proper because the
third parties are not responsible parties, and, even if they are responsible parties,
the judge had the discretion to refuse to join them because it would delay the
trial.

These essentially are the issues before us. To resolve them,
we must review  the case law on third
parties as well as the allegations in the third amended petition and the third-
party petition.  Then, even if we decide
the financial institutions are responsible third parties, as the Plaintiffs
claim, we still must determine whether the trial judge abused his discretion in
refusing to add them.  If we conclude there
was an abuse of discretion, we must consider the last hurdle raised by the
PlaintiffsCthat Andersen has an adequate
remedy at law. 

A.      Denial
Of Leave to Join Third PArties

Andersen contends that the trial court abused its discretion
by denying leave because the third parties are Aresponsible third parties@ under Chapter 33 of the Texas
Civil Practice Remedies Code, and, thus, Andersen has the right to have the
entire case, including issues of proportionate responsibility and contribution,
tried at one time.  The Plaintiffs
respond that the third parties are not Aresponsible third parties@ under Chapter 33, but even if
they are, the trial court had complete discretion to deny joinder.

1.       The Definition of AResponsible Third Party@                   








Chapter 33[18]
grants defendants the ability to join Aresponsible third parties@ to a suit.[19]  Section 33.004 provides, Aon timely motion made for that
purpose, a defendant may seek to join a responsible third-party who has not
been sued by the claimant.@  Tex.
Civ. Prac. & Rem. Code Ann. ' 33.004 (Vernon 1997).  If a Aresponsible third party@ is joined under section
33.004, the trier of fact determines the percentage
of responsibility for each claimant, each defendant, each settling person, and
each responsible third party.  Tex. Civ. Prac. & Rem. Code Ann. ' 33.003 (Vernon 1997).   A Aresponsible third party@ is defined as any person to
whom all of the following apply:     

(i) the
court in which the action was filed could exercise jurisdiction over the person;

(ii) the person could have been, but
was not, sued by the claimant; and

(iii) the person is or may be
liable to the plaintiff for all or a part of the damages claimed against the
named defendant or defendants.   

Tex. Civ. Prac. & Rem. Code
Ann. ' 33.011(6)(A) (Vernon 1997).  

Here, the third parties satisfy part (i)
of the definition because the  trial
court could exercise jurisdiction over them. 
They have apparently generally appeared in the severed suit because they
removed it to federal court.  The parties
seem to recognize this and focus on parts (ii) and (iii) of the
definition.  Because parts (ii) and (iii)
overlap somewhat, we will address them together.  We are required to review the allegations
regarding the third parties= role to determine whether they
satisfy parts (ii) and (iii).  See
Hernandez v. Houston Lighting & Power Co., 795 S.W.2d 775, 776 (Tex.
App.CHouston [14th Dist.] 1990, no
writ) (considering defendant=s pleadings to determine
whether third party was a proper defendant); 
Ryland Group, Inc. v. White, 723 S.W.2d
160, 162 (Tex. App.CHouston [1st Dist.] 1986, orig.
proceeding) (citing plaintiffs= pleadings and defendants= claim that third parties also
liable to conclude joinder was required); Geophysical
Data Processing Center, Inc. v. Cruz, 576 S.W.2d 666, 667 (Tex. Civ. App.CBeaumont 1978, no writ)
(stating the propriety of joining parties in any legal proceeding is dependent
primarily, although not always exclusively, upon the state of the relevant
pleadings).

 

 

 








2.       How the
Pleadings Implicate the Third Parties 

The allegations regarding the third parties center on their
role in the Enron transactions that involved special purpose entities.[20]  The Plaintiffs allege that the Enron
defendants, particularly Fastow, used the special
purpose entities to achieve Aoff-balance sheet@ treatment, and, thereby,
conceal Enron=s debt and artificially inflate
its earnings.[21]  The Plaintiffs further allege that the use of
special purpose entities in these circumstances was improper under generally
accepted accounting principles; therefore, Andersen should have consolidated
the transactions onto Enron=s balance sheets.  According to the Plaintiffs, the eventual
consolidation of the transactions onto Enron=s balance sheets contributed to
its financial collapse and the devaluation of the Plaintiffs= stock.  The pleadings implicate the third parties in
the transactions as follows:

                 
Chewco/JEDI (Michael Kopper and Barclays)








The Plaintiffs allege that Enron entered into a partnership
called JEDI; Fastow then formed a special purpose
entity called Chewco to buy an outside investor=s interest in JEDI.  The Plaintiffs allege that Kopper was directly involved in and benefitted
financially from the Chewco/JEDI transactions, and Fastow used Kopper to control the
transactions.[22]  The Plaintiffs further allege that Barclays
loaned $191.5 million (guaranteed by Enron) to Chewco
to purchase the outside investor=s interest in JEDI and then
continued to fund Chewco by the millions.  According to the Plaintiffs, the transactions
were conducted so that the loans would be inaccurately reflected as outside
equity investments.[23]

                 
Mahonia Prepay Transactions (J.P.
Morgan Chase)

The Plaintiffs allege that the Enron defendants Ain concert with@ J.P. Morgan Chase
misrepresented billions in loans as legitimate Aprepays@ from customers.  According to the Plaintiffs, Enron=s financial statements
improperly characterized the loans as energy trading activity with a special purpose
entity called AMahonia@ created by J.P. Morgan Chase.[24]

                 
CSFB=s Prepay Transactions

In its mandamus petition, Andersen asserts that CSFB was
engaged in the type of prepay transactions the Plaintiffs allege were
fraudulent.  The Plaintiffs do not specifically
mention CSFB in connection with prepay transactions.  However, Andersen alleges in its third-party
petition that CSFB was involved in negotiating, structuring, reviewing,
financing and/or implementing transactions involving special purpose entities,
and profited from the transactions. 
Also, Andersen presented evidence of CSFB=s involvement in prepay
transactions.[25]








                 
Nigerian Barges (Merrill Lynch)

The Plaintiffs allege that the Enron defendants pressured
Merrill Lynch to purchase three Nigerian power generation barges.  However, the Enron defendants guaranteed
Merrill Lynch it would not lose money and would Abe taken out of the deal@ within a few months, and
Merrill Lynch received an up-front fee of $250,000 plus 15% per annum for the
period that it held this investment; as guaranteed, the Enron executives
subsequently told Kopper to have another special
purpose entity buy Merrill Lynch=s interest.  The Plaintiffs allege that this fraudulent Asale@ of assets enabled Enron to
falsely record $12 million in earnings.[26]

                 
LJM Partnerships (Kopper, CSFB,
J.P. Morgan, Merrill Lynch, Bank of America, Lehman Brothers, and CIBC) 








The Plaintiffs allege that special purpose entities called
LJM Cayman, L.P. and LJM2 Co-Investment, L.P., run by Fastow,
were integral to the scheme to manipulate Enron=s financial results.[27]  Enron allegedly engaged in twenty-four
transactions involving the LJM partnerships, including complex hedging
transactions worth billions, which were adverse to Enron=s interests.  According to the Plaintiffs, the LJM
transactions enabled the defendants to move poorly performing assets
off-balance sheet, manufacture earnings, and improperly inflate the value of
investments by back-dating documents.  In
addition, Fastow allegedly had a secret agreement
that ensured the LJM partnerships would not lose money in their dealings with
Enron.  The Plaintiffs further allege the
LJM transactions were tainted by a conflict between Fastow=s fiduciary duties to the LJM
partnerships and his fiduciary duties to Enron, and an LJM2 offering memorandum
to investors expressly acknowledged this conflict of interest but represented
that it would benefit Fastow and the investors.  According to the Plaintiffs, Fastow and the other LJM investors profited by the millions
through the LJM transactions.  Kopper and CSFB are the only potential third parties that
the Plaintiffs mention as LJM investors or partners.[28]  However, in its motion for leave and
third-party petition, Andersen pleads that J.P. Morgan, Merrill Lynch, Bank of
America, Lehman Brothers, CIBC, and/or their executives, were also LJM
investors or partners.[29]

3.       With These
Allegations, the Plaintiffs Could Have Sued the Third Parties and the Third
Parties May Be Liable to Them. 

In spite of these broad, sweeping allegations, the
Plaintiffs still claim this suit is not about the financial institutions.  They still claim this suit is about Ken Lay=s visit to Brenham and the
representations he made there,[30]
which enticed the Plaintiffs to invest initially, plus the representations Lay,
Andersen and the other primary defendants made through press releases and
financial reports to entice the Plaintiffs to continue holding their Enron
stock.  For this reason, they say, the
suit is not about the financial institutions, but about the conduct in
Washington County, and so, they could not have sued the third parties and the
third parties could not be liable to the Plaintiffs.  For several reasons, we think they are wrong.








First, based on these pleadings, we do not agree that these
suits are not in any way about the financial institutions.  We would not go so far as to say that they
are all about the financial institutions, but, certainly, the financial
institutions play a pivotal role in the stories the Plaintiffs will tell the
jury.  The Plaintiffs seem to be saying
that they will have the jurors put on blinders so that they can see only the
alleged bad acts of Lay, Andersen, and a few others.  But, as the brief history of this debacle
shows and these pleadings allege, the fall of Enron is not about one person, or
even a few people; it is the story of a host of actors.  On these pleadings, asking the jury, or us,
to look only at Lay, Fastow, Skilling,
Andersen, and some of its partners, is like asking someone to look only at the
eye of the hurricane and to ignore the furor surrounding it.  Neither is an accurate picture. 

Second, for the third parties to be liable for fraud, they
need not have made representations directly to the Plaintiffs.  Texas case law has held that each party to a
fraudulent scheme is responsible for the acts of the other participants done in
furtherance of the scheme and liable for fraud. 
See Skrepnek v. Shearson Lehman Bros., Inc.,
889 S.W.2d 578, 580 (Tex. App.CHouston [14th Dist.] 1994, no
writ); Corpus Christi Teachers Credit Union v. Hernandez, 814 S.W.2d
195, 202 (Tex. App.CSan Antonio 1991, no
writ).  Further, a party who benefits
from a fraudulent transaction may be a principal in the fraud and liable as
such. First State Bank of Miami v. Fatheree,
847 S.W.2d 391, 396 (Tex. App.CAmarillo 1993, writ denied)
(citing Corpus Christi Teachers, 814 S.W.2d at 202).  In fact, a party has been liable for the
fraudulent misrepresentations of a third party by mere silent acquiescence when
he benefitted from the fraud.  See Bransom
v. Standard Hardware, Inc., 874 S.W.2d 919, 924 (Tex. App.CFort Worth 1994, writ denied); Corpus
Christi Teachers, 814 S.W.2d at 202. 
Therefore, although the third parties may not have misrepresented
anything to the Plaintiffs, they may be liable for fraud because they allegedly
participated in the fraudulent transactions and reaped the benefits.[31]








Third, the Plaintiffs also argue that the third parties
cannot be liable for conspiracy to commit fraud without being liable for the
underlying fraud because conspiracy is a derivative tort.  See Tilton v. Marshall, 925 S.W.2d 672, 681 (Tex. 1996) (defining the derivative tort
of civil conspiracy as a combination of two or more persons to accomplish an
unlawful purpose, or to accomplish a lawful purpose by unlawful means).  Plaintiffs are mistaken.  A party may be liable for conspiracy to
commit fraud without being liable for the underlying fraud.  A defendant=s liability for conspiracy
depends on Aparticipation in some
underlying tort for which the plaintiff seeks to hold at least one of the
named defendants liable.@  See id. (emphasis added).  Civil conspiracy Acame to be used to extend
liability in tort beyond the active wrongdoer to those who have merely planned,
assisted, or encouraged his acts.@  See Carroll v. Timmers
Chevrolet, Inc., 592 S.W.2d 922, 925 (Tex. 1979) (quoting W. Prosser, Handbook of the Law of Torts ' 46, at 293 (1971)).  Once a conspiracy is proven, each
co-conspirator is responsible for all acts done by any of the conspirators in
furtherance of the unlawful combination. 
See id. (citing State v. Standard Oil Co., 107 S.W.2d 550,
559 (Tex. 1937).  Therefore, the third parties may be liable to
the Plaintiffs for conspiracy to commit fraud because the Plaintiffs seek to
hold at least one of the defendants liable for fraud.[32]








In sum, Andersen has shown that the third-party defendants
are implicated in the Plaintiffs= pleadings to such an extent
that the Plaintiffs could have sued each third party, and that each third party
Amay@ be liable to the Plaintiffs
for all or a part of the Adamages claimed@ against Andersen and the other
defendants.  Thus, Andersen has met its
burden to show that the third parties are Aresponsible third parties@ under Chapter 33.[33]  We now turn to the penultimate issue: whether
the trial court abused its discretion.

B.      Abuse
Of Discretion

Andersen contends the trial court abused its discretion by
denying leave to join these Aresponsible third parties@ because it denied Andersen the
right to have one jury apportion liability among all potentially responsible
parties.  The Plaintiffs contend that,
even if the third-party defendants are potentially responsible third parties,
the trial court acted within its broad discretion in denying joinder.  They claim joinder is a bad choice because it will delay the trial,
because Andersen waited almost a year after Plaintiffs filed suit to file the
third-party action and has waived its right to join third parties, and because
adding them will increase costs, confuse the jury, and prejudice the
Plaintiffs.[34]








The Plaintiffs are correct that a trial court ordinarily has
great discretion regarding joinder of third
parties.  See Tex. R. Civ. P. 38; Tex. Civ. Prac. & Rem. Code Ann. ' 33.004 (requiring timely
motion to join responsible third parties); Valley Indus., Inc. v. Martin,
733 S.W.2d 720, 721 (Tex. App.CDallas 1987, orig. proceeding);
Threeway Constructors, Inc. v. Aten, 659 S.W.2d 700, 701 (Tex. App.CEl Paso 1983, no writ).  However, mandamus relief is appropriate if
the trial court abuses that discretion.  See,
e.g., Jones v. Ray, 886 S.W.2d 817, 822B23 (Tex. App.CHouston [1st Dist.] 1994, orig.
proceeding) (granting mandamus relief because severance of the plaintiffs= claims against some defendants
from claims against other defendants would prohibit jury from apportioning
appropriate percentage of responsibility for each defendants= conduct); see also Ryland, 723 S.W.2d at 163 (granting mandamus relief
because severance of defendants= third-party claims violated
the defendants= right to have the liability of
all original and third-party defendants determined in the primary suit under
then version of Chapter 33).  

As to joinder of third parties, A[o]ne
leading commentator in Texas procedural law states, >[l]eave should be liberally
granted.=@  See David F. Johnson, Paying For
The Sins of AnotherCParental Liability in Texas for
the Torts of Children,
8 Tex. Wesleyan L. Rev. 359, 377
(2002) (quoting Roy W. McDonald, Texas Civil Practice ' 5:75 (1992)).  Joinder rests on
the concept of judicial efficiency and the policy of providing full and
adequate relief to the parties.  See
id. (citing OKC Corp. v. UPG Inc., 798 S.W.2d 291, 293 (Tex. App.CDallas 1984, no writ).  A court=s decision on joinder should be based on practical considerations with a
view to what is fair and orderly.  See
id. at 378 (citing Fireman=s Fund Ins. Co. v. McDaniel, 327 S.W.2d 358, 373 (Tex. Civ. App.CBeaumont 1959, no writ).  The court may indeed consider whether joinder will delay the trial.  See id. (citing Valley Indus.,
733 S.W.2d at 721).  However, the key is
whether a delay is reasonable under the facts and circumstances of the suit,
keeping in mind the history of the suit, and not simply that a delay will
occur.  See id. at 377-78; Tex. R. Civ. P. 37 (allowing additional
parties to be brought in . . .Abut not at a time or in a manner
to unreasonably delay the trial of the case@) (emphasis added).








Here, the extraordinary facts and circumstances surrounding
the Enron collapse dictate joinder and far outweigh
any delay the joinder may cause.[35]  As we have discussed, the Plaintiffs allege
that numerous, complex, fraudulent transactions heavily contributed to the
collapse and their resulting damages. 
The Plaintiffs and Andersen allege the third parties were intimately
involved in the transactions, invested millionsCand billions in some casesC and benefitted
financially from them.  Most
significantly, the Plaintiffs and Andersen allege the third parties were
involved in concealing the transactions from stockholders such as the
Plaintiffs.[36]  Yet, Andersen has been denied the opportunity
to have the jury in this suit determine whether the third parties may also be
liable to the Plaintiffs.  Based on
judicial efficiency and the policy of providing full and adequate relief to the
parties, Andersen has the right to have the entire case tried at one time and
have one jury apportion liability among all responsible parties.








The Plaintiffs urge several other reasons that the trial
court acted within its discretion by denying leave.  For instance, they assert that Andersen did
not seek to join the third parties until nearly a year after the Plaintiffs
filed suit.  However, due to the enormity
and complexity of the the Enron collapse, we reject
the suggestion that Andersen should have known the extent of the third parties= involvement sufficiently to
join them only two months after the Enron collapse.[37]  Instead, knowledge of the third parties= alleged role unfolded over
time.[38]  Most significantly, the Plaintiffs first
implicated the third parties in their second amended petition; Andersen moved
for leave to join them three days later. 
Consequently, we find no delay in seeking joinder
that justifies the trial court=s denying leave.

Next, the Plaintiffs argue that joining the third parties
will multiply the costs of litigation and discovery.  However, the Plaintiffs, not Andersen,
interjected these transactions into the suit. 
Moreover, even if the financial institutions are not joined, the pleadings
and allegations concerning the financial institutions will force the parties to
obtain discovery from the third parties.[39]  In particular, Andersen notes it needs
discovery from the third parties to show the transactions were appropriate and
properly recorded, or that critical information was not disclosed to Andersen.  The discovery to be conducted is potentially
massive regardless of the joinder. 

The Plaintiffs further argue that joining the third parties
will confuse the jury.  Again, the
Plaintiffs interjected the extensive and complex facts regarding the
transactions into the suit. Therefore, even without joinder,
the Plaintiffs will presumably introduce the transactions to the jury because
they are at the heart of the Plaintiffs= claims.  Again, Andersen will also presumably rely on
the transactions to defend itself. 
Therefore, we reject the argument that any potential jury confusion
justifies the denial of joinder.

Finally, the Plaintiffs generally assert they will be
prejudiced by the joinder.  To the contrary, for the reasons we have
discussed, Andersen could be unfairly prejudiced if denied the right to join
the third parties.  

In sum, because we conclude that the decision to deny leave
to join third parties amounted to a clear and prejudicial error of law, the
trial court abused its discretion.

 








C.      No Adequate Remedy At Law

Having found an abuse of discretion, we consider whether
Andersen has an adequate remedy at law. 
Andersen asserts it does not because it may be foreclosed in the future
from obtaining contribution from the third parties.  We say Amay be foreclosed@ because the law on this issue
is not settled.  In Casa Ford, Inc. v.
Ford Motor Co., 951 S.W.2d 865, 877 (Tex. App.CTexarkana 1997, pet. denied),
the court held that Chapter 33 does not permit a tortfeasor
subject to a judgment to bring a post-judgment contribution claim against a tortfeasor who was not a party to the primary suit.  However, the Plaintiffs assert that the Texas
Supreme Court suggested the opposite in dicta in Ingersoll-Rand Co. v.
Valero Energy Corp., 997 S.W.2d 203, 208 (Tex. 1999).  There, the court addressed contractual
indemnityCnot contribution for a tort
judgment.  See id.  Nevertheless, the court stated A[i]n
a suit for either contribution or indemnity the injury upon which suit might be
based does not arise until some liability is established.  In this case, as in a contribution claim
against a joint tortfeasor, liability could not
have been established until judgment was rendered.@ See id. (emphasis
added).  Because this issue is not
settled, Andersen must gamble on how a court considering a later contribution
action might rule on the issue. 
Therefore, we cannot state with certainty that Andersen will have an
adequate remedy in a separate suit against the third parties.[40]









Even if Andersen could prosecute a separate suit against the
third parties, it is the opportunity to have one jury apportion
liability among all responsible third parties that Andersen seeks.[41]  

Relator has a substantial right to
present the complete set of intertwined facts and issues germane to his claims,
to one factfinder, in one proceeding,
rather than in two separate suits that are all but foreordained to generate,
collectively, a decision destined to fail in the appellate process.  The denial of that right would introduce the Aempty chair defense,@ and thereby skew the progress
and entire conduct of the proceedings-with the resultant potential to affect
the outcome of the litigation profoundly, and to compromise the presentation of
the parties= respective claims or defenses in
ways unlikely to be apparent in the appellate record.

Jones, 886 S.W.2d at 822 (citations omitted).

Similarly, due to the third parties= alleged role in the Enron
collapse, their absence would likely profoundly affect the conduct and outcome
of this suit in ways unlikely to be apparent in the appellate record.  Moreover, due to the enormity of the facts
surrounding the collapse, any separate action against the third parties, or
even a successful appeal in this suit, would result in an enormous waste of resources.  The additional expense and effort of
preparing for and participating in two separate trials does not, standing
alone, justify mandamus relief.  See
id. at 822 n.9 (citing Walker v. Packer, 827 S.W.2d at 842).  However, when a trial court=s error will cause a waste of
judicial resources, we may properly consider that factor in determining the
adequacy of an appeal.  See id.  Therefore, the potential waste of resources,
when combined with the possibility that Andersen may not be able to prosecute a
separate suit against the third parties, or successfully appeal in this suit,
supports our conclusion that Andersen has no adequate remedy at law.

                                                              

 








                                                 V.  CONCLUSION

Having found that the trial court abused its discretion in denying
Andersen leave to join the third parties, and Andersen has no adequate remedy
at law, mandamus relief is appropriate. 
Accordingly, we sustain Andersen=s second issue.  Because we sustain Andersen=s second issue, we need not
consider its first issue challenging the February 14, 2003 severance
order.  We also sustain in part Andersen=s supplemental challenge to the
July 15, 2003 scheduling order and hold that it is vacated to the extent it
conflicts with our ruling that Andersen be allowed to join the third parties. 

We are confident the trial court will (1) vacate its April
29, 2003 order and enter an order granting Andersen leave to join the third
parties addressed in this opinion and (2) amend the July 15, 2003 scheduling
order to allow the addition of the new parties and corresponding changes in the
pretrial deadlines.  Therefore we
conditionally issue this writ.  If the
trial court fails to follow this order, the writ will issue.  Having disposed of this original proceeding,
we lift the stay imposed by our order of August 7, 2003.

 

 

/s/      Wanda McKee Fowler

Justice

 

 

Judgment
rendered and Opinion filed October 23, 2003.

Panel
consists of Justices Fowler, Edelman, and Seymore.











[1]  Although the
Plaintiffs are the Areal parties in interest@ in this
mandamus proceeding, we will refer to them as Athe
Plaintiffs@ for consistency.





[2]  Cause No.
32,716; Bullock, et al. v. Arthur Andersen LLP, et al.; in the 21st
Judicial District of Washington County, Texas. 





[3]  The Andersen
individual defendants are D. Stephen Goddard, Jr., David B. Duncan, Debra A.
Cash, Roger Willard, and Thomas H. Bauer; the Enron individual defendants are
Andrew S. Fastow, Kenneth L. Lay, and Jeffrey J. Skilling.





[4]  Between the
original petition and this second amended petition, the case was removed twice
and then remanded to the state court.





[5]  Michael Kopper was an assistant to Fastow.






[6]  J.P. Morgan
Chase includes J.P. Morgan Chase & Co., J.P. Morgan Securities, Inc., J.P.
Morgan Chase Bank, and Chase Securities, Inc.





[7]  CSFB includes
Credit Suisse First Boston, Credit Suisse First Boston (USA), Inc., Credit
Suisse First Boston Corp., and Donaldson, Lufkin & Jenrette Securities
Corporation.





[8]  CIBC includes
Canadian Imperial Bank of Commerce, CIBC Inc., and CIBC World Markets Corp.





[9]  Bank of
America includes Bank of America Corp., Bank of America, N.A., and Banc of
America Securities LLC.





[10]  Barclays
includes Barclays PLC and Barclays Bank PLC.





[11]  Lehman
Brothers includes Lehman Brothers Holding, Inc. and Lehman Brothers, Inc.





[12]  Merrill Lynch=s full name is Merrill Lynch, Pierce, Fenner & Smith Incorporated a/k/a Merrill Lynch &
Co.





[13]  The petition
also contained a cross-claim against Fastow. 





[14]  The severed
suit is entitled Choucroun, et al. v.
Arthur Andersen LLP, et al.  The
third parties subsequently removed it to federal court, and it was then
transferred to the Judicial Panel for Multidistrict Litigation.





[15]  The Plaintiffs= law firm represents stockholders in numerous other
suits based on substantially the same facts and claims.  Several such suits are pending before the
Honorable Melinda Harmon of the United States District Court for the Southern
District of Texas, including a securities class action entitled Mark Newby,
et al. v. Enron Corporation, et al. 
Judge Harmon stayed discovery in the underlying suit from May 1, 2002
until April 24, 2003, while she ruled on motions to dismiss filed by the third
parties in Newby. 





[16]  Andersen also
attacks the February 14, 2003 severance order, but we need not address that
order in light of our holding concerning the April 29, 2003 and July 15, 2003
orders.





[17]  Although this
order was entered after Andersen filed the mandamus, Andersen filed a
supplement to its mandamus petition, claiming that the trial court abused its
discretion in its entry of this order. 
Because it directly impacts Anderson=s
ability to join third parties, we have considered it. 





[18]  Several
sections of Chapter 33 cited in this opinion were recently amended.  See An Act Relating to Reform of Certain
Procedures and Remedies in Civil Actions, 78th Leg., R.S., ch.
204, art. 4, '' 4.01, 4.02, 4.03, 4.04, 4.05, 2003 Tex. Sess. Law Serv. (Vernon) (to be codified as amendments to Tex. Civ. Prac. & Rem. Code Ann. '' 33.002, 33.003, 33.004, 33.011).  However, the amendments apply only to suits
filed on or after July 1, 2003, and, therefore, do not apply to this suit.  See id. ' 23.02
(c).





[19]  With limited
exceptions not applicable here, Chapter 33 applies to all tort actions.  See Tex. Civ.
Prac. & Rem. Code Ann. ' 33.002  (Vernon Supp. 2003). 





[20]  We make no
conclusions regarding the truth of these allegations or whether the third
parties will ultimately be found liable. 
See Tex. Civ. Prac. &
Rem. Code Ann. ' 33.002(f) (providing that nothing in this section
regarding the applicability of Chapter 33 requires submission to the jury of a
question regarding conduct by any party absent sufficient evidence to support
the submission).  Instead, we consider
whether the allegations, if true, show that they may be liable.  See Ryland,
723 S.W.2d at 162 (concluding joinder required based
on plaintiffs= and defendants= claims
although whether plaintiffs= theory of recovery will be submitted to the jury can
only be determined after the evidence is closed).





[21]  A criminal
complaint has been filed against Fastow in the United
States District Court for the Southern District of Texas in connection with the
Enron transactions charging, among other offenses, securities fraud, money
laundering, and conspiracy to commit fraud.





[22]  The Plaintiffs
also discuss transactions involving special purpose entities called ARADR ZWS, L.L.C.@ and ARADR ZWS MM, L.L.C.,@ which
were allegedly concealed from stockholders. 
Although Andersen does not specifically outline the RADR transactions in
its mandamus petition, the Plaintiffs implicate Kopper
in these transactions. 





[23]  In addition,
Andersen presented a newspaper report that according to congressional
testimony, the Barclays= loans were structured to hide them from Enron=s auditors, and their subsequent discovery played a
central role in the Enron financial collapse.





[24]  Andersen
included in this record testimony before the United States Senate of Robert
Roach, the senate investigator on AThe Role
of the Financial Institutions in Enron=s Collapse.@  Mr. Roach
reported that the financial institutions involved (including J.P. Morgan Chase)
funded the prepays, participated in the required trades, and allowed Enron to
use offshore entities that they controlled as sham trading partners Afor the explicit purpose of allowing Enron to disguise
multi-million-dollar loans as trading activity.@  He further testified these financial
institutions understood Enron=s goal was to increase operating cash flow without
reporting debt, and designed and implemented the financial structures to help
Enron achieve its objective.





[25]  Robert Roach
testified that to help Enron characterize prepay funds as coming from energy
trades, several financial institutions (including CSFB) were careful not to
include requirements or descriptive language in the prepay documentation that
would disclose the true nature of the transaction.  In particular, CSFB instructed its lawyers, Avery important for them [Enron] is that the docs are
as standard as possible and DO NOT include any representations on accounting
driven transactions.@  Roach
concluded that the prepays intentionally made it impossible for investors,
analysts, and other financial institutions to uncover Enron=s true indebtedness.





[26]  Andersen
presented a Wall Street Journal article reporting that Merrill Lynch
agreed to pay $80 million to resolve SEC charges that it aided Enron in
fraudulently overstating its earnings through the Nigerian barge project;
Senate investigations revealed that Merrill Lynch Atemporarily@
purchased the barges from Enron and questioned whether the sale was truly a
loan; and a senator characterized some of the financial institutions as Aparties to Enron=s
financial deceptions.@





[27]  The criminal
complaint against Fastow also cites his alleged
involvement in the LJM transactions.





[28]  The Plaintiffs
note that Kopper pleaded guilty to criminal
conspiracy to commit wire fraud and money laundering with respect to the Enron
transactions and agreed to pay proceeds to the government.





[29]  In its
mandamus petition, Andersen asserts that CIBC was also involved in off-balance
sheet transactions called AHawaii@ and ABraveheart.@  However, the
Plaintiffs do not detail any AHawaii@ or ABraveheart@ transactions. 
Instead, Andersen relies mostly on evidence that is not a part of the
mandamus record to explain these transactions. 
Regardless, we may conclude CIBC is a Aresponsible
third party@ based on its alleged involvement in the LJM
transactions.





[30]  The Plaintiffs
stress that they received Enron=s financial reports in Washington County, and Lay
represented in his speech Ajust what a great investment Enron was and how much he
expected the stock price to increase.@





[31]  The Plaintiffs
argue that their Afactual background allegations make reference to the
third parties@ only to emphasize the types of transactions the
defendants failed to disclose; they claim they do not show that the third
parties may be liable to the Plaintiffs. 
We disagree. The discussion regarding the third parties is more than
simply background material.  If proved,
the transactions, by their nature, were a means to conceal Enron=s true financial condition.  The Plaintiffs use the words Afraud@ and Aconspired@ in some
instances when describing the third parties=
roles.  In fact, in her order staying
discovery in this and other shareholder cases, Judge Harmon rejected the
Plaintiffs= attempts to Arepeatedly
characterize their cases as grounded in representations@ made by Lay at the Washington County meeting because
the discovery requested by the Plaintiffs Areveals
that the case may begin with a meeting in Brenham, but certainly does not end
there.@





[32]   The
Plaintiffs also maintain that an actionable conspiracy requires a Ameeting of the minds@; thus,
Andersen=s claim that the third parties may be liable for conspiracy
is inconsistent with its claim that it was ignorant of the transactions and was
misled.  However, Andersen can deny
liability for conspiracy but allege, in the alternative, that the third parties
are also liable for conspiracy.  See
Tex. R. Civ. P. 48 (allowing
alternative defenses).  Nevertheless, the
third parties may be liable for conspiring with the Enron executives.





[33]  In its
mandamus petition, Andersen also seeks to join the third parties as Acontribution defendants.@  There is a distinction between a Acontribution defendant@ and a Aresponsible third party.@  A Acontribution
defendant@ means Aany
defendant, counter-defendant, or third-party defendant from whom any party
seeks contribution with respect to any portion of damages for which that party
may be liable, but from whom the claimant seeks no relief at the time of
submission.@  Tex. Civ. Prac. & Rem. Code Ann. ' 33.016(a) (Vernon 1997) (emphasis added).  The jury determines the percentage of
responsibility of a Acontribution defendant@ separately
for purposes of contribution to the defendants, and not as part of the global
apportionment of responsibility.  See  Tex.
Civ. Prac. & Rem. Code Ann. '
33.016(c) (Vernon 1997).  On the other
hand, the trier of fact determines the percentage of
responsibility of a Aresponsible third party@ as part
of the global apportionment of responsibility. 
See Tex. Civ. Prac. &
Rem. Code Ann. ' 33.003. 
Andersen continually refers to its desire to have one jury apportion
percentages of responsibility Aamong@ all potentially responsible parties.  Therefore, we interpret the mandamus petition
as primarily seeking leave to join the third parties as Aresponsible third parties,@ and secondarily as Acontribution
defendants.@  The
requirements for joinder of a Acontribution defendant@ are
less stringent than the requirements for joinder of a
Aresponsible third party.@  Compare Tex. Civ. Prac. & Rem. Code Ann. ' 33.016(b) (Vernon 1997) (providing defendant may
assert the right to contribution Aagainst any
such person as a contribution defendant in the claimant=s action@) with
Tex. Civ. Prac. & Rem. Code Ann.
' 33.011(6)(A) 
(prescribing three-part definition of Aresponsible
third party@). 
Consequently, the following reasons for allowing Andersen to join the
third parties as Aresponsible third parties@ apply if Andersen, alternatively, seeks to join them
as Acontribution defendants.@





[34]  Although the
Plaintiffs argue joinder will delay the trial, after
they filed their response to the mandamus petition, the trial court delayed the
trial to enable them to timely designate experts. 





[35]  In her opinion
on the third parties= motion to dismiss in Newby, Judge Harmon
recognized that the rapid collapse of Enron and the resulting scope, variety,
and severity of losses are unprecedented in American corporate history.  See Newby, 235 F. Supp. 2d 549, 565
(S.D. Tex. 2003).





[36]  Andersen also
presented evidence that some of the transactions may have been intentionally
concealed from it.  Lynn Turner, former
SEC chief accountant, reported to the United States Senate that Andersen gave
some good guidance regarding treatment of the prepay transactions, and it
appeared Alike some people almost attempted to mislead Andersen,
which is highly unfortunate.@





[37]  According to
the Plaintiffs, Enron unraveled and its stock plummeted in October and November
2001.  Enron filed bankruptcy on December
2, 2001.  The Plaintiffs filed suit on
January 24, 2002.





[38]  The Senate
reports regarding the role of the third parties were not issued until July
2002.  Kopper
did not plead guilty to criminal charges until August 2002.  The criminal complaint against Fastow was not filed until October 2002.  The first settlement by a financial
institution (Merrill Lynch) with the SEC regarding the transactions at issue
occurred in February 2003.





[39]  The Plaintiffs
have stated that they do not necessarily need discovery from the third
parties.  However, in ordering the stay
of discovery, Judge Harmon stated the Plaintiffs had undertaken a Amassive amount of discovery@ including subpoenas requesting all records pertaining
to numerous LJM partnerships.





[40]  We question
whether Ingersoll is even contrary to Casa
Ford.  The court may have meant
that a claim for contribution against a joint tortfeasor,
whose percentage of responsibility was already determined in the primary
suit, does not accrue until judgment is rendered.  See Tex.
Civ. Prac. & Rem. Code Ann. ' 33.015
(Vernon Supp. 2003).  Further, we note
that despite its dicta in Ingersoll, the court
previously denied review of Casa Ford. 
In addition, after Ingersoll, another
court relied on Casa Ford, albeit in an unpublished case, and the
Supreme Court denied review.  See BDO Seidman, LLP v. Bracewell &
Patterson, LLP, No. 05-02-00636-CV, 2003 WL 124829, at *2 (Tex. App.CDallas, January 16, 2003, pet. denied). 
For these reasons, we cannot rely on Ingersoll
to rule that Andersen could bring a separate suit for contribution against the
third parties if they are not joined here. 





[41]  The Plaintiffs
also assert that Andersen can obtain contribution from the third parties in Newby.  However, any such right would not rectify the
lack of opportunity to have one jury apportion liability among all responsible
parties in this suit.