**Affirmed and Memorandum Opinion filed July 17, 2014.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-13-00309-CV

---

### ANGELA WILLIAMS, Appellant

### V.

### SHELL EXPLORATION AND PRODUCTION COMPANY - AMERICAS, BRICE PETERSON, AND CARMIE CHATTERS, Appellees

---

**On Appeal from the 334th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2011-61948**

---

## M E M O R A N D U M   O P I N I O N

Appellant, Angela Williams, sued appellees, Shell Exploration and Production Company – Americas ("Shell"), Brice Peterson, and Carmie Chatters, for intentional infliction of emotional distress, tortious interference with prospective business relations, and conspiracy. Williams's claims were based on appellees' alleged conduct towards Williams while she was employed by Shell and

supervised by Chatters and Peterson.  Williams appeals the trial court's summary judgment in favor of appellees on all claims.  We affirm.

## I. BACKGROUND

Williams began working for Shell in 2006.  In 2008, she successfully applied for a different position, reserves analyst, within the company.  In that position, Chatters was appellant's reporting manager, Peterson was the department head, and Williams trained under Leigh Adams.  According to Williams, Adams harassed and berated her, and Chatters failed to remedy the situation.  Williams also contends that Chatters eventually began treating Williams with "disregard and condescension" because Williams reported errors she discovered during a "Reserve Review."

In late 2009, Shell began a process of reorganization, which included redistribution and reduction of personnel.  The process required certain employees, including Williams, to re-apply for positions within the company.  During the first round of the process, Williams learned she would not be retained in her current position and would be severed from Shell if she did not obtain a new position.  During the second round of the process (in early 2010), Williams applied for three additional positions.

Williams had two interviews with Ebere Chimezie, the hiring manager for one such position.  Williams asserts that during the second interview, Chimezie said he had narrowed his choice to "a couple of" candidates and Williams was a "strong possibility" to get that position.  It is unclear from Williams's deposition testimony whether she claims Chimezie made this latter representation or Williams gleaned she was a "strong possibility" based on the interview.  In any event, Chimeze said he needed to review Williams's 2009 Individual Performance Factor

2

("IPF"), which is a numerical representation of an employee's performance review. The interviews occurred before Williams received her 2009 review.

Shortly thereafter, Williams received her 2009 review. Chatters included some positive information about Williams's performance; but Chatters also reported that Williams was challenged in her relationships with key staff members which limited her ability to deliver results in some respects. Williams learned her IPF had been downgraded as a result of the review.

Subsequently, Chimezie emailed Williams,

You are receiving this mail (copied in bcc) because you have applied for the above position . . . .  To help us with the evaluation process, kindly email me, the last 3 years of your Individual Performance Ranking (IPF).

Please treat as very urgent.

Williams responded by listing her IPFs for 2006-2008 and stating the 2009 IPF was "currently being reviewed." Although Williams had already received the 2009 IPF, she was challenging the performance review and associated IPF through Shell's internal procedures.

After Williams received her 2009 IPF, she applied for the other two positions. The only communications from that hiring manager, Alan Davies, were emails thanking Williams for the applications and stating, "We will be in touch in due course."

Williams was severed from Shell on March 31, 2010 because she failed to secure another position. On October 14, 2011, she sued appellees for intentional infliction of emotional distress, tortious interference with prospective business relations, and conspiracy to tortiously interfere. Williams requested actual and exemplary damages.

3

In her petition, Williams's factual complaints fell into four categories:

- Chatters failed to remediate Adams's harassment of Williams;
- Chatters treated Williams with "disregard and condescension" because Williams reported the errors discovered during the Reserve Review;
- Chatters and Peterson ignored requests for information regarding Williams's work performance from the hiring managers for the three prospective positions; and
- Chatters included, with Peterson's approval, unsubstantiated negative information on Williams's 2009 performance review, causing a reduction in her IPF.

Williams contends the latter two actions precluded her from obtaining one of the prospective positions and remaining employed by Shell. Williams further claims Chatters intended that result because she harbored "personal animosity" based on Williams reporting Adams's harassment and errors in the Reserve Review. Williams included Shell as a defendant on the ground the individuals were acting within the scope of their employment.

Appellees filed a motion for summary judgment on all claims, to which Williams responded. The trial court signed a summary judgment, dismissing all of the claims with prejudice.

## II. ANALYSIS

In her first three issues, Williams challenges the trial court's grant of summary judgment on all of her claims. Williams's fourth and final issue is a contention that she is entitled to exemplary damages because she asserts a valid claim for actual damages.

## A.    Claim for Intentional Infliction of Emotional Distress

In her first issue, Williams contends the trial court erred by granting summary judgment on her claim for intentional infliction of emotional distress.

Intentional infliction of emotional distress is a "gap-filler" tort applicable only when "a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress." *Hoffmann– La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 447 (Tex. 2004). The elements of the tort are (1) the defendant acted intentionally or recklessly, (2) the defendant's conduct was extreme and outrageous, (3) the conduct caused the plaintiff emotional distress, and (4) the emotional distress was severe. *Id.*

Appellees moved for summary judgment on the following grounds: (1) Williams cannot maintain the claim because recovery for mental anguish is available under her tortious-interference cause of action; (2) the alleged conduct was not "extreme and outrageous;" and (3) the emotional distress allegedly suffered by Williams was not severe. We agree the alleged conduct was not "extreme and outrageous" as a matter of law; thus, we need not consider the other grounds.

### 1. Standard of Review

The contention that appellees' conduct was not extreme and outrageous is a traditional summary-judgment ground. A party moving for traditional summary judgment must establish there is no genuine issue of material fact and it is entitled to judgment as a matter of law. *See* Tex. R. Civ. P. 166a(c); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215–16 (Tex. 2003). A defendant moving for traditional summary judgment must negate at least one element of each of the plaintiff's theories of recovery or plead and conclusively establish each element of an affirmative defense. *Science Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997). If the defendant establishes his right to summary judgment as a matter of law, the burden shifts to the plaintiff to present evidence raising a genuine issue of material fact. *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197

(Tex. 1995). We review a summary judgment *de novo*. *Knott*, 128 S.W.3d at 215. We take all evidence favorable to the nonmovant as true and indulge every reasonable inference and resolve any doubts in her favor. *Id.*[1]

## 2. Applicable Law

"Extreme and outrageous" in the context of this tort means conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Hoffmann–La Roche*, 144 S.W.3d at 445; *GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 611 (Tex. 1999). Generally, "insensitive or even rude" behavior does not constitute extreme and outrageous conduct. *GTE*, 998 S.W.2d at 612. Similarly, liability does not extend to "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Id.* Further, it is not enough that the defendant acted with an intent that is tortious, malicious, or even criminal, or that he intended to inflict emotional distress. *Id.* at 616. Although the defendant's intent is relevant, the conduct itself must be extreme and outrageous to support liability. *Id.* It is for the court to determine, in the first instance, whether a defendant's conduct was extreme and outrageous. *Id.* However, when reasonable minds may differ, it is for the jury, subject to the court's control, to determine

---

[1] At the outset of the motion, appellees asserted they were moving for summary judgment under Rule 166a(c), which governs traditional motions. *See* Tex. R. Civ. P. 166a(c). Then, when summarizing their arguments, appellees asserted Williams's claims are barred by the statute of limitations (relative to the tortious interference claim), which is a traditional summary-judgment ground, "and/or she has no evidence to support one or more essential elements of her claims"—the standard for a no-evidence motion. *See id.* 166a(i). However, appellees never cited Rule 166a(i) or expressly stated the motion contained both traditional and no-evidence grounds. They cited only Rule 166a(c) and the standard for a traditional motion. We construe appellees' contention that their conduct was not "extreme or outrageous" as a traditional ground because they argue Williams's factual allegations cannot establish an element of the claim as a matter of law.

whether the conduct was sufficiently extreme and outrageous to result in liability. *Id.*

In deciding whether particular conduct rises to an extreme and outrageous level, courts should consider both the context of the conduct and the parties' relationship. *Id.* at 612. In the workplace, while an employer's conduct might in some instances be unpleasant, the employer must have some discretion to "supervise, review, criticize, demote, transfer, and discipline" its workers. *Id.* Accordingly, the supreme court has declined to recognize intentional-infliction-of-emotional-distress claims for "ordinary employment disputes," emphasizing that extreme conduct in this context "exists only in the most unusual of circumstances." *Id.* at 612–13. "The range of behavior encompassed in 'employment disputes' is broad, and includes at a minimum such things as criticism, lack of recognition, and low evaluations, which, although unpleasant and sometimes unfair, are ordinarily expected in the work environment." *Id.* at 613.

### 3. The Conduct at Issue

Williams's claim for intentional infliction of emotional distress was apparently based on the four factual complaints mentioned above.[2]

We will discuss the first two complaints together because our analysis is similar. With respect to the alleged harassment by Adams, Williams testified as follows in her deposition. Beginning in October 2008, during some of their interactions, Adams instructed Williams to "shut up," not speak unless Adams

---

[2] In the "Statement of Facts" section of her appellate brief, Williams mentions all of the factual complaints made in her petition. However, in her subsequent argument, Williams asserts that the act of ignoring requests for information was the basis for the intentional-infliction claim and advances no argument that any other acts would support that claim. Nonetheless, we will liberally construe her brief and address summary judgment on this claim as to all of her factual complaints.

gave permission, and refrain from embarrassing herself and the department in meetings, and beckoned her "like a dog." Williams reported these remarks to Chatters, who possessed authority to remedy the situation, but she replied, "You just need to suck it up. Some people just talk that way." The remarks ceased in April 2009 when Williams insisted that Adams not speak to her in that manner. Relative to Chatters's alleged "disregard and condescension," Williams testified their relationship eventually evolved to the point that Chatters refused to acknowledge Williams when they passed in the hallway.

Williams likens her allegations to the situation in *GTE*—the unusual case in which the supreme court affirmed an award of damages for intentional infliction of emotional distress based on workplace behavior. *See* 998 S.W.2d at 617. In *GTE*, a supervisor's behavior created a "den of terror" for the three employees who later sued the employer. *See id.* Over a period of two years, the supervisor engaged in a pattern of "grossly abusive, threatening, and degrading conduct," which included:

- daily using the "harshest vulgarities," including cursing, obscene jokes, and sexual innuendo, with intent to abuse the employees;

- frequently physically and verbally assaulting the employees, including lunging headfirst at them with his fists balled before stopping uncomfortably close to their faces;

- screaming, yelling, and pounding his fists when making requests of the employees;

- threatening the employees with losing their jobs;

- raging about the employees leaving items such as purses or umbrellas on office furniture;

- threatening to "get even" when they complained about his behavior;

- repeatedly calling one employee into his office and staring at her for extended periods or standing over her desk staring at her;

- telling one employee during an annual review, "You're mean and you're deadly, very deadly;"

8

- forcing the employees to vacuum the floors although the company had a cleaning service and forcing one employee to clean spots on the floor on her hands and knees and clean tobacco stains from a wall;

- ordering an employee who forgot some work-related paperwork to wear a post-it stating, "Don't forget your paperwork."

*See id.* at 613–14.

The supreme court held that the severity and regularity of the supervisor's behavior exceeded "the necessary leeway to supervise, criticize, demote, transfer, and discipline" employees and moved into the "realm of extreme and outrageous conduct":

> Occasional malicious and abusive incidents should not be condoned, but must often be tolerated in our society. But once conduct such as that shown here becomes a regular pattern of behavior and continues despite the victim's objection and attempts to remedy the situation, it can no longer be tolerated. It is the severity and regularity of [the supervisor's] abusive and threatening conduct that brings his behavior into the realm of extreme and outrageous conduct. Conduct such as being regularly assaulted, intimidated, and threatened is not typically encountered nor expected in the course of one's employment, nor should it be accepted in a civilized society. An employer certainly has much leeway in its chosen methods of supervising and disciplining employees, but terrorizing them is simply not acceptable.

*Id.* at 617.

In contrast, taking Williams's testimony as true, Adams's remarks over a six month period may be characterized as rude and insulting. However, they do not rise to the level of terrorizing, threatening, and assaultive conduct that occurred over a two-year period in *GTE. See id.* at 613–17. Moreover, Williams does not allege that Chatters made these remarks—only that she failed to stop Adams from doing so. This aspect of the allegation supports that Williams's complaint is an ordinary employment dispute because she complains about a matter within Chatters's discretion as Williams's supervisor—whether to intervene in a conflict

among employees. Further, Chatters's alleged refusal to acknowledge Williams in the hallway, even if "petty," is minor compared to the abuse endured by the *GTE* employees.

We will also consider together Williams's third and fourth factual complaints because our analysis is similar. Williams claims that Chatters (with Peterson's approval) intended to end Williams's career at Shell and thereby caused her emotional distress. On appeal, Williams cites the following communications as evidence that Chatters and Peterson received, and intentionally ignored, requests for information about Williams from the hiring managers for the prospective positions: (1) the emails from Davies to Williams (on which Chatters was copied) stating he would "be in touch in due course;" (2) the email from Chimezie to Williams requesting her 2009 IPF; (3) Williams's testimony that she informed Chatters of her plan to interview for Chimezie's position and Chatters would have received an email notification of the application; and (4) Williams's testimony indicating that after the severance, Chimezie told her he had tried to obtain information about her reduced 2009 IPF, although he did not identify the persons whom he contacted. Williams essentially cites her own opinions expressed in her deposition as evidence that the negative information in her performance review was intentionally false.

Relative to the claim for intentional infliction of emotional distress, appellees did not present a summary judgment ground contending the evidence negates, or there is no evidence, to support these allegations. Thus, we will assume, solely for purposes of discussion, that they are true.

With respect to these allegations, this case is akin to *Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814 (Tex. 2005)—"the tenth time in little more than six years, [the supreme court reversed] an intentional infliction of emotional distress

10

claim for failing to meet the exacting requirements of that tort." *Id.* at 815. In that case, the court held that even an employer's post-termination retaliatory actions against its former employee did not constitute "severe and outrageous" conduct sufficient to establish the tort. *Id.* at 817. Similar to the present case, the plaintiff claimed the employer refused to give her a reference or take calls seeking a reference. *Id.* The employer also engaged in actions more extreme than those in the present case. *See id.* For instance, the employer forced another employee, who was providing *gratis* post-termination housing to the plaintiff, to evict the plaintiff or face termination herself. *Id.*

The court stated the employer's actions, if true, were "callous, meddlesome, mean-spirited, officious, overbearing, and vindictive—but not 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* at 817–18. The court summarized, "We certainly understand judicial reticence to dismiss claims like this one stemming from heinous acts. But except in circumstances bordering on serious criminal acts, we repeat that such acts will rarely have merit as intentional infliction claims." *Id.* at 818 (noting *GTE* as example of conduct bordering on criminal and sufficient to support the tort).

Likewise, even if appellees' actions relative to Williams's attempts to obtain another position may be characterized as malicious and vindictive, as she suggests, *Creditwatch* dictates they do not rise to the requisite level of "extreme and outrageous" conduct. *See id.* at 817–18. Rather, the negative review and refusal to provide information to potential hirers, even if unfair and based on questionable motives, cannot be removed from the realm of an ordinary employment dispute. *See also Lassiter v. Wilkenfeld*, 930 S.W.2d 803, 807–08 (Tex. App.—Beaumont 1996, writ denied) (holding physician's apparent attempt to have hospital

11

administrator fired for physician's own personal reasons did not rise to the requisite level of extreme conduct even if "morally unjustifiable").

Finally, recognizing that the *GTE* court focused on the pattern of behavior, in addition to the severity, *see* 998 S.W.2d at 617, we evaluate the totality of the alleged behavior in the present case: six months of Adams making rude and insulting, but not threatening or obscene, remarks to Williams; Chatters eventually refusing to acknowledge Williams when they passed in the hallway; and Chatters and Peterson including some negative information in Williams's performance review and refusing to provide information about her to prospective hiring managers. We conclude, as a matter of law, that there was no pattern of behavior "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Hoffmann–La Roche*, 144 S.W.3d at 445.

Accordingly, the trial court did not err by granting summary judgment on the claim for intentional infliction of emotional distress. We overrule Williams's first issue.

**B.      Claim for Tortious Interference with Prospective Business Relations**

In her second issue, Williams challenges summary judgment on her claim for tortious interference with prospective business relations.

To prevail on a claim for tortious interference with prospective business relations, the plaintiff must establish (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party, (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct, (3) the defendant's conduct was independently tortious or

unlawful, (4) the interference proximately caused the plaintiff injury, and (5) the plaintiff suffered actual damage or loss as a result. *Coinmach Corp. v. Aspenwood Apt. Corp.*, 417 S.W.3d 909, 923 (Tex. 2013).

Appellees moved for summary judgment on the tortious interference claim on several grounds: (1) the claim is barred by the statute of limitations; and (2) Williams failed to raise a genuine issue of material fact regarding the following elements: (a) there was a reasonable probability a business relationship would have been entered into; (b) any interference by appellees was intentional; and (c) appellees committed an independently tortious or unlawful act. We conclude the trial court properly granted summary judgment on the ground that appellees' conduct was not independently tortious or unlawful—again, a traditional summary-judgment ground.[3] Thus, we need not consider the other grounds.

### 1.    Applicable Law

In *Wal–Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 713, 726 (Tex. 2001), our supreme court propounded the requirement that, to prevail on a claim for tortious interference with prospective business relations, the plaintiff must prove the defendant's conduct was "independently tortious or unlawful"—conduct that is already recognized to be wrongful under the common law or statute. The court explained that conduct which is merely "sharp" or perceived as "unfair competition" is not actionable as tortious interference with prospective business relations. *Id.* at 726. The plaintiff is not required to prove an independent tort;

---

[3] At the outset of the portion of the motion challenging the tortious interference claim, appellees asserted that Williams "has failed to adduce any evidence" on the elements—which again sounds as a no-evidence ground. However, we construe the argument that followed regarding the element at issue as a traditional ground because appellees asserted their conduct, even if true, was not independently tortious or unlawful.

instead, she need only establish that the defendant's conduct would be actionable under a recognized tort. *Id.* at 713, 726.

## 2.      The Conduct at Issue

Williams pleaded the claim for tortious interference based on only one alleged action:  Chatters and Peterson ignoring requests for information from the hiring managers for the prospective positions.[4]  Williams maintains there was a "reasonable probability" she would have obtained one of the positions if not for this action.

On appeal, for the elements of the cause of action, Williams cites a sister court case issued before the supreme court held in *Wal-Mart* that the defendant must have committed an independently tortious or other unlawful act.  Williams does not mention this element set forth by the supreme court, much less suggest a tortious act allegedly committed by Chatters or Peterson relative to the conduct at issue.  The only argument we can possibly construe on this element is Williams's assertion that Chatters was "obligated" to "follow up" with, or respond to, the hiring managers and failed to do so.  Williams cites no evidence that Shell's company policy imposed such an obligation.  Nonetheless, assuming there were such an obligation, appellant cites no authority that Chatters's (or Peterson's) alleged violation of an internal company policy constituted a tortious or other unlawful act.  Accordingly, Williams has not demonstrated that the trial court erred

---

[4] In the portion of her appellate brief specifically challenging summary judgment on the tortious interference claim, Williams focuses exclusively on the act of ignoring requests for information, consistent with her pleading.  However, at other points in her brief, she also suggests the claim was based only on the negative performance review or based on both the negative review and the act of ignoring requests for information.  We will consider only this latter action because we review a summary judgment based on the pleadings on file at the time of the hearing, and a claim not asserted in the trial court cannot form the basis for reversal. *See* Tex. R. Civ. P. 166(a)(c); *Wakat v. Montgomery County*, No. 09-09-00188-CV, 2011 WL 1224459, at *4 (Tex. App.—Beaumont Mar. 31, 2011, no pet.) (mem. op.).

by granting summary judgment on the tortious interference claim. We overrule Williams's second issue.

## C.    Claim for Conspiracy

In her third issue, Williams challenges summary judgment on her claim for conspiracy to tortiously interfere with prospective business relations. "Conspiracy" is generally defined as "a combination of two or more persons to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means." *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996). Conspiracy is a "derivative tort" because a defendant's liability depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable. *Id.* If all named defendants' liability for the alleged underlying tort is foreclosed as a matter of law, there is no claim for conspiracy. *See id.*; *Soon Phat, L.P. v. Alvarado*, 396 S.W.3d 78, 94 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). Because the trial court properly granted summary judgment as to all appellees on the tortious interference claim pleaded by Williams, it did not err by granting summary judgment on the conspiracy claim. We overrule Williams's third issue.

## D.    Request for Exemplary Damages

Finally, in her fourth issue, Williams contends she is entitled to seek exemplary damages because she asserts a viable claim for actual damages. Because the trial court properly granted summary judgment on all claims for actual damages, we overrule Williams's fourth issue.

Having overruled all of Williams's issues, we affirm the trial court's judgment.

/s/    John Donovan
Justice

Panel consists of Justices McCally, Busby, and Donovan.